## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

NATIONWIDE PROPERTY           )
CASUALTY INS. CO., as subrogee of    )
JOSEPH and BRITAIN PAQUETTE,     )
     Plaintiffs,                     )
                                  )
v.                                    )    CIVIL ACTION 5:16-cv-69
                                  )
A+ CHIMNEY SERVICE,          )
     Defendants.                  )

## MOTION TO PRECLUDE DEFENDANT A+ CHIMNEY SERVICE'S EXPERTS, TIMOTHY MORSE, Ph.D., MARK LAREAU AND THOMAS HIRCHAK, FROM TESTIFYING AT TRIAL

**I.**     **INTRODUCTION**

In this action arising from a residential fire, defendant A+ Chimney Service has identified three expert witnesses: Timothy Morse, Ph.D., CFEI, Mark Lareau and Thomas J. Hirchak III. Dr. Morse offers opinions on liability issues, including the origin and cause of the fire and the defendant's conformity with the common law standard of care, state law and national standards pertaining to chimney sweeping and any inspections that are required to accompany them. Mr. Lareau opines about the diminution in value of the real property before versus after the subject fire. Mr. Hirchak opines about the personal property destroyed in the fire.

Based on their written reports and their deposition testimony, plaintiff seeks to preclude all three witnesses from testifying at trial, based on inadequate qualifications, foundation and fit.

## II.    FACTS

The fire in this case occurred at the home of Joseph and Britain Paquette at 1052 Main Street North, Bakersfield, VT.  They purchased the home in 2007, and it came with a Jotul woodstove served by a "metalbestos" chimney.[1]  From the time they purchased the home to the fire, they exclusively used A+ Chimney, owned by Alton Ingalls, to tend to their chimney cleaning and related needs.[2]  Plaintiff alleges in this case that Ingalls did not properly perform his cleanings and did not perform the required inspections along with his cleanings.  As a result, he loosened a cleanout cap in the chimney system, causing it to drop out of its position before this fire, thereby allowing sparks and embers to escape and ignite combustibles outside the chimney.

As will be discussed below, A+ advances the theory that the subject fire started inside the chimney and through heat transfer, secondarily ignited nearby combustibles outside the chimney.  A+ asserts that the cap fell out not before the fire, but at some point during the fire, and was dislodged from its secured position by the impact when the structure and chimney collapsed and hit something.

### A.    Chimney Configuration

The woodstove/chimney arrangement is important to this motion.  (Diagrams used in discovery are attached hereto as Exhibit "D").  The woodstove was in the living

---

[1]    Some of the deposition transcripts use the phrase "metal asbestos" instead of "metalbestos".  The two terms are interchangeable.

[2]    There is a conflict, not relevant to this Daubert motion, regarding contractual expectations.  The Paquettes expected Ingalls not only to clean the chimney, but also to use his expertise and experience to discover and alert them to any other problems related to the woodstove and chimney.  (Joseph Paquette, pp. 38 – 39)(pertinent portions of the Paquette deposition are attached hereto as Exhibit "A"); (Britain Lencki (f/k/a Britain Paquette), pp. 35 – 36)(pertinent portions of the Lencki deposition are attached hereto as Exhibit "B").  Ingalls testified that he was hired solely to clean the chimney.  (Ingalls, p. 20)(pertinent portions of the Ingalls deposition are attached hereto as Exhibit "C").  Ingalls admittedly was unaware that, contractual terms aside, there was a national standard and later a Vermont law that obligated him to do an inspection in addition to the cleaning.  (Exh. "C", p. 33).

room, which had a cathedral ceiling.  It was vented from behind with a single-walled stovepipe assembly visible in the living room.  The pipe started at an outlet in the back of the appliance's housing, where it made a 90° turn upward for several feet, whereupon, there was another 90° turn to the horizontal direction.  At that point, the single-walled stovepipe entered a horizontal, double-walled chimney connector, and disappeared behind the living room wall.[3]  As will be discussed below, Ingalls was familiar with the living room portion of the venting system from his cleaning activities at the Paquette home.

The double-walled chimney connector then protruded through the living room wall.  The next element of the system, concealed behind the living room wall, was a double-walled Tee connector, so named because of its shape.  The Tee had three ends, with the Tee oriented like a "T" rotated 90° from the usual T orientation.  The horizontal end is where the metal chimney connector entered.  The other two ends were vertically oriented, one below the intersection with the horizontal chimney connector, and other above.  (A diagram of a typical, though not identical tee connector is attached hereto as Exhibit "E").  The downward end was designed and equipped with a removable insert called a Tee plug or a cleanout cap which, when in place, closed off the opening.  The cleanout cap and bottom opening made a male-female connection.[4]

The upward end or outlet side of the Tee connector was open and engineered to mate with vertical tube sections that comprised the vertical run of the chimney up to and through the roof.  This portion of the chimney, collectively called the metalbestos

---

[3]  The horizontal section that passed through the wall consisted of a stainless steel chimney connector routed inside a cylindrical masonry tube so the metal did not touch the wall elements.  The masonry cylinder is called a "thimble".

[4]  There is a factual dispute, discussed below, about the specifics of the connection between the Tee and cleanout cap in this case.

chimney, was hidden from view above the ceiling of the office on the opposite side of the living room wall.  It was concealed in a way that also prevented access to the cleanout cap.

Before the fire, Ingalls had no knowledge whether the metalbestos chimney and the cleanout cap were readily accessible on the other side of the living room wall.  He never asked the Paquettes and he never looked.  (Ingalls, Exh. "C", pp. 21 – 24).

The top of the chimney protruded through the roof and terminated with a weather cap.  Ingalls was aware of this portion of the chimney because he cleaned it from the roof.  The vertical length of chimney was over 10 feet.

**B.**   **A+'s Chimney Cleaning Procedure at the Paquette Residence**

Ingalls cleaned the chimney once annually from 2007 to 2013, although one year, the Paquettes called him out mid-season for a second cleaning.  (*Id.*, p. 102).  The last cleaning before the fire was in November 2013.

On his visits to the Paquette residence he only performed a cleaning.  At no time did he inspect the chimney or the woodstove.  (*Id.*, 95).

His cleaning process started on the roof.[5]  He removed the weather cap and pushed his brush downward, forcing any debris to fall as much as 10 feet to the cleanout cap at the bottom of the Tee.  To make sure he brushed the entire length of the chimney, Ingalls went by feel, *i.e.*, pushed his brush down until it contacted the inside surface of cleanout cap two or three times each cleaning.  (*Id.*, 81 – 85).

He then descended from the roof and entered the living room to clean up the dislodged debris that had fallen into the base of the vertical run of the metalbestos

---

[5]      For brevity plaintiff omits irrelevant steps in the cleaning process such as laying down tarps.

chimney. (*Id.*, 88 – 90). Ingalls cleaned the vertical chimney from the living room only, by removing the stovepipe from the chimney connector, standing on the woodstove, reaching his arm into the chimney connector and using his hands to remove creosote and ash. This method informed him only that the cap was there; admittedly, it did not tell him how firmly it was held in place: "I had no way of knowing if the end cap was secure." (*Id.*, p. 93).

C.   **National Standard, Vermont Law**

The National Fire Protection Association (NFPA) is a code-generating organization that establishes standards for fire-related processes and procedures. NFPA 211 is the "Standard for Chimneys, Fireplaces, Vents and Solid Fuel-Burning Appliances." Ingalls was aware of the existence of this "national" standard since his early days working as a chimney sweep for other companies. (*Id.*, p. 27 - 28). He had it in his truck and would page through it when he was "bored" waiting for a customer. (*Id.*, p. 28). He never took a course in it. (*Id.*, p.12). He established his own business in 2003 and at no time since has he obtained or looked at the Standard. (*Id.*, p. 28).

On November 5, 2012, the State of Vermont adopted NFPA 211 into law. (Proof of the adoption is attached hereto as Exh. "F"). Ingalls performed two cleanings at the Paquette home between the codification of NFPA 211 and the subject fire. He had no knowledge of its adoption, not only when he did those two cleanings, but up to the time the law was shown to him at his deposition on September 28, 2016. (Ingalls, Exh. "C", pp. 29 – 32).

The Vermont law had two salient requirements. It required chimney sweeps to become certified by the Chimney Safety Institute of America, and it required chimney

sweeps doing routine chimney cleanings to perform a Level I inspection.[6]   (Exh. "F").

Ingalls admittedly did neither.  (Ingalls, Exh. "C", pp. 20, 37).

**D.    The Fire**

The fire occurred in the evening of February 26, 2014.  In the days preceding the

fire, the Paquettes' woodstove was not working well.  It was not heating normally.  It

produced more smoke and less flame.  (Lencki, Exh. "B", pp. 61 – 62).  It had trouble

getting up to temperature.  (Paquette, Exh. "A", p. 46); (Lencki, Exh. "B", p. 67).

They tried to burn a creosote log on the day of the fire.  That evening, Britain

Paquette, her son and his friend were in the home.  The difficulties with the woodstove

continued.  Smoke appeared in the woodstove, and Britain reacted by opening the damper

and the door of the stove, which helped somewhat.  (Lencki, Exh. "B", p. 68).

The fire was discovered when the boys were in the living room and reported to

Britain that they were seeing black smoke pouring out from where the stovepipe entered

the wall.  (*Id.*, p. 70).  She saw the smoke and went into the office on the other side of the

living room wall to get her car keys.  There she saw flames coming down from the

ceiling, right where it met the wall.  (*Id.*, pp. 70 – 71, 75).

They did not hear any unusual sounds before discovering the smoke.  (*Id.*, P. 70).

After discovering the smoke, she heard crackling sounds coming from the ceiling, not the

stovepipe.  (*Id.*, pp. 82 - 83).  Upon evacuating the house, she encountered an

acquaintance of hers who had pulled into their driveway to report that she had seen

---

[6]     NFPA 211 has required Level I inspections to be done with cleanings at least
since 2007 when Ingalls started working at the Paquette residence.  Thus, from 2007
to 2011, his repeated failure to perform a Level I inspection constituted a violation of
the standard of care.  For the next two cleanings, the same omission became a
violation of Vermont law.

flames shooting out of the roof.  (*Id.*, p. 76).  Britain also observed the roof on fire above the living room.  (*Id.*, p. 77).

Plaintiff alleges that the cleanout cap was held in place by friction, and that Ingalls' chimney cleaning activities exerted repeated push-out forces on it by the thrusts of the brush and falling debris, causing the cap to be loose and ultimately dislodge between the last cleaning and the fire.[7]  With the cleanout cap out of place and the bottom of the Tee connector unplugged, plaintiff alleges that sparks, embers and other products of combustion escaped the intended path up the chimney and discharged out the open bottom of the tee, igniting combustible materials below.  Thus, plaintiff contends that this was an attic fire, not a chimney fire.  A+ argues that the fire started as a chimney fire and, by heat transfer through the chimney, spread to involve combustible materials outside the chimney.

E.       **A+'s Liability Expert**

A+ has identified Timothy Morse, Ph.D., CFEI as its liability expert.  Morse is a mechanical engineer with a bachelors, masters and Ph.D. in the field.  He also is a Certified Fire and Explosion Investigator.

In this case, A+ was placed on notice of the February 26, 2014 fire on March 3, 2014.  A joint fire scene examination was held on March 18, 2014.  A+ sent Richard Jones, a fire investigator, to that scene examination and to a subsequent joint laboratory examination of the retained evidence, but A+ has not disclosed Jones as a testifying expert.

---

[7]       After the fire, the cap was found separated from the Tee.  The parties dispute when and how they came to be separated.  Plaintiff contends it was before the fire because of repeated loosening by Ingalls' cleaning techniques, while defendant argues that it became dislodged during the fire due to the impact of the chimney, cap in place, falling and impacting with an unidentified thing.

A+ first hired Morse in November 2016, two and one-half years after being notified of the claim.  Morse did not go to the fire scene.  A+ has not asked for him to examine the retained evidence.  His investigation was limited to a review of photographs from the fire scene and laboratory examinations, discovery materials and a few items he obtained for the case.

As for the subjects he addressed, at first he was retained to address only the origin and cause of the fire.  (Morse deposition, p. 20)(pertinent portions of the Morse deposition are attached hereto as Exhibit "G").  However, his report shows that the scope of his investigation expanded to include opinions regarding Ingalls' due care or lack thereof.  Essentially, Morse renders the following essential opinions:

1.      The fire started inside the chimney flue;

2.      It was caused by a spark or ember from the woodstove that rose through the stovepipe, entered the chimney and ignited built-up creosote lining the flue walls;

3.      The fire stayed within the chimney for an unspecified period, and then spread beyond as a result of heat transfer that raised the temperature of combustibles outside the chimney to their ignition temperature;

4.      The cleanout cap was firmly in place from the start of the fire until the roof collapsed and the chimney fell, causing an impact that dislodged it; and

5.      Despite being unaware of the requirement to perform a Level I inspection along with his cleaning, Ingalls fully satisfied the requirement.

Morse's opinions lack relevance and reliability because of his inadequate qualifications, his lack of any scientific foundation or methodology and the lack of fit between his assumed facts and the known facts of record.

1.    **Qualifications**

Morse lacks education and experience in every area of his investigation.  In the origin and cause area, Morse's opinion is that this fire started as a chimney fire.  He cannot recall a single case in which he has been called upon to investigate a chimney fire in a metalbestos chimney:

> Q.      So as you sit here today, do you have any recollection of ever having investigated a case where the issue was whether or not there was a chimney fire in a Metalbestos-type chimney?
>
> A.      Not specifically.  One or both of the Maine cases may have been a chimney fire in a Metalbestos chimney, but I don't remember specifically.

(Morse, Exh. "G", p. 35).[8]  Thus, he lacks any prior experience with chimney fires in metalbestos chimneys.

His research into metalbestos chimney fires for this case is similarly scant and he admits he did not rely on it in forming his opinions in this case:

> Q.      Okay.  For this case have you done any research into chimney fires?
>
> *               *               *               *
>
> A.      So I've spoken with colleagues of mine at Exponent about chimney fires and I reviewed a chapter in a fire investigation book on chimney fires.
>
> Q.      And what fire investigation book was that?
>
> A.      I don't remember the title specifically.  I think of it as Kirk's Fire Investigation.  I know the name Kirk's is in the title, but I may be getting the title a little bit incorrect.
>
> *               *               *               *
>
> Q.      Okay.  So which chapter was it in Kirk's?
>
> A.      I don't remember the chapter number.

---

[8]      Morse acknowledged broadly that he could not remember the specifics of the Maine cases because they were so long ago.  (Morse, Exh. "G, p. 18).

Q.      And you don't identify that chapter in Kirk's anywhere in your report, do you?

A.      I do not.

Q.      Why not?

A.      Because I'm not relying on anything in that book for the opinions I've expressed in my report.

Q.      Okay.  And the colleagues that you spoke to, you don't reference those conversations anywhere in your report, either, do you?

A.      I do not.

Q.      Why not?

A.      Because I'm not relying on those conversations for any of the opinions I express in my report.

(*Id.*, pp. 35 – 36).

Without prior experience or research for this case, Morse relies on his education in the field of mechanical engineering.  However, he could not recall if he had ever had classroom instruction specific to chimney fires:

Q.      … what are you relying on in regard to your opinion that this fire began as a chimney fire?

A.      I'm relying on my education; I'm relying on my experience investigating fires; I'm relying on my training involving investigating fires; I'm relying on my understanding of chimneys, my understanding of fires, my understanding of combustion through multiple publications that I've reviewed over the past ten years.

Q.      Okay.  So basically accumulated knowledge and experience is what you're saying, right?

A.      Yes.

Q.      Have you ever had any education relating to chimney fires?

A.      Yes.

Q.      And tell me about that.

A.      So I have a bachelor's of engineering degree in mechanical engineering, and that covers multiple engineering principles that are directly relevant to understanding how chimneys work, how fires work, how chimney fires can occur.

Q.      Okay.  Did any of your mechanical engineering courses in college ever specifically deal with chimney fires?

A.      I don't remember specifically.  That may have been a topic that came up at some point.

Q.      Okay.  But your class in fluid dynamics or your class in the internal combustion engine or something like that, that never got down to the specifics of having a lecture or a chapter or a unit on chimney fires, did it?

A.      There may well have been a lecture on chimney fires.  In my mind the engineering principles that are relevant for understanding a chimney fire are taught throughout multiple courses, so I wouldn't be surprised if there was a particular lecture that talked about a chimney fire.

Q.      Okay.  Do you recall one as you sit here today?

A.      No, I don't recall one specifically.

Q.      And how long ago was it that you got your bachelor's degree?

A.      That was in 2003.

Q.      Okay.  And do you have any other education aside from your mechanical engineering courses toward your bachelor degree that specifically taught you about chimney fires?

A.      So I also have a master's of science in mechanical engineering and a Ph.D. in mechanical engineering, and through that education I learned about engineering principles that are directly relevant to understanding chimneys, fires, and chimney fires.

Q.      Okay.  So aside from just learning the general principles that apply to chimney fires, have you had any courses or any education that was specific to chimney fires?

A.      So in addition to the education I've described, I am a Certified Fire & Explosion Investigator.  As part of obtaining that certification, I attended a 40-hour course that covered different aspects of fire investigation.  That would have included fires involving combustion equipment like wood stoves.

Q.      Okay.  And again, was there anything specific in your training for your CFEI designation specific to chimney fires?

A.      I think much of what I learned during that training was relevant to understanding chimney fires.  There may have been a specific example case or issues that were discussed in that 40-hour course, but I don't remember specifically.

(*Id.*, pp. 36 – 39).

Morse has testified as a fire origin and cause investigator only once before, and in that case, he concluded that the fire was caused by a lightning strike.  (*Id.*, pp. 43 – 44).

Morse lacks any qualifications to testify about Alton Ingalls' compliance *vel non* with the national or local standard of care and/or compliance with the Vermont law.  He has no first-hand experience as a chimney sweep or chimney inspector.  (*Id.*, p. 14).  He identified four prior cases involving "whether the condition of the chimney was related to the cause of the fire."  (*Id.*, p. 15).  However, in none of those cases did he express opinions related to a chimney sweep's compliance with the standard of care.  (*Id.*, pp. 17 – 19).  The inquiry was then expanded:

Q.      In any of your consulting experience, have you ever been called upon to testify or generate opinions about the standard of care of a chimney sweep?

A.      Not in a report or in testimony.

Q.      Okay.  So that implies that there have been occasions where you've dealt with the standard of care in some other way?

A.      So I expect that in some of the cases I've described to you I would have spoken with my client and talked about issues associated with the standard of care for a chimney sweep.

Q.      And do you have any specific recollection of having done so in any prior case?

A.      No.

(*Id.*, p. 19).

The particular Chapter of NFPA 211 that governs chimney inspections is Chapter

14.  He has no prior experience reading, interpreting or applying it:

> Q.      Okay.  I've asked you a lot of questions about whether any of your prior
> investigations involved the standard of care of a chimney sweep and whether or
> not it was complied with.  I want to ask similar questions about the standard of
> care of someone performing a Level I inspection of a chimney pursuant to
> Chapter 14 of NFPA 211.  Before this case, have you ever had a case where you
> were asked to reach opinions regarding whether or not someone performing a
> Level I inspection had complied with the standard of care or not?
>
> A.      I don't remember having done so.

(*Id.*, p. 21)(see also *Id.*, pp. 19 - 20).

### 2.      Scientific foundation or methodology

Morse bases his opinion that the fire started inside the chimney on speculation,

supposition and *ipse dixit* rather than on any reliable factual or scientific basis.  Similarly,

his interpretations of NFPA 211 are not based on anything other than his own beliefs and

say-so rather than any reliable sources, reproducible methodologies or relevant

experience.

### a.      Origin and Cause

His primary opinion that the fire started inside the chimney flue is premised on an

unsupported assertion that the cleanout cap was in place at the time of the fire and thus

any sparks or embers given off by the woodstove would remain within the chimney.[9]  Of

course, no one was in a position to see firsthand the cleanout cap when the fire first broke

---

[9]      Plaintiff has physical evidence that the cap was apart from the Tee in the fire –
the mating surfaces that would have been protected from fire damage if the cleanout
cap was in place, but here the mating surfaces show significant fire damage.  This
proves that it was not in place during the fire.

out; it was concealed behind the living room wall and above the ceiling of the adjacent office.  Morse bases his opinion that it was firmly in place on (1) Ingalls' testimony, (2) an exemplar Tee and cap he obtained in November 2016, and (3) an Installation Manual he downloaded from the internet.  Taking each in turn, it is clear that Morse lacks a reasonable foundation for his opinion.

Ingalls admits to having known that the chimney included a Tee connector with a removable cleanout cap.  He further admits that at no time did he even look to see if that cap was accessible.  He cleaned the debris by reaching in the horizontal chimney connector from his perch atop the Paquettes' woodstove.  Ingalls admits, however, that he could not vouch for how firmly the cap was secured in its receptacle:

> Q.     Is it fair to say that every time you did that cleaning out of the tee, you could feel if the cap was in place?
>
> A.     Correct.
>
> Q.     And every time you did that, the cap was in place?
>
> A.     I could see it and I could feel it.
>
> Q.     Okay.  But will you also agree with me that you couldn't tell how securely it was in place, because you couldn't see the securing side of the tee, of the cap, right?
>
> MR. HEATH: Object to the form of the question.  If you can answer it, go ahead.
>
> A.     I had no way of knowing if the end cap was secure.

(Ingalls, Exh. "C", pp. 92 – 93).

Morse, like Ingalls, acknowledged the limitations on sensing how firmly in place the cleanout cap was based on feel:

Q.      Okay.  If you are cleaning the tee connector with your hands from the inside rather than removing the cap from the outside, can you tell by feel how firmly the cap is in place?

        MR. HEATH:  Just for the record, object to the form of the question.  This is inside a tee, not a tee connector, but go ahead.

A.      I mean, to some degree I don't think you can quantify it precisely.

Q.      Okay.  How can you tell?

A.      So I expect in the process of removing material, you'll be bumping your hand against the plug and you can detect whether or not it moves.

Q.      Okay.  And does movement of the cap when you're doing that say whether it's securely in place or not?

A.      I think if you can't move it easily with your hand, then it's sufficiently in place for -- for use.

Q.      Okay.  Will you agree with me that if you are cleaning the tee from the inside, you have no way of seeing if the retainer clips are in place if that's the securement method that's used?

A.      Yes.

Q.      And if you're cleaning the tee from the inside, will you agree with me that you cannot see if the masonry units are properly in place to keep the cap in place?

A.      I mean, you -- you can't see it, I suppose, but if we're imagining supporting the plug with a masonry block, if the masonry block is no longer in place, I expect that that plug is going to be very easy to push out and that you would notice that with your hand, so even though you can't see that fact, you could detect that fact.

Q.      So you've posited a situation that's either on or off; the masonry block is fully in place or it's fully out of place, but there are an infinite number of variations in between those two extremes, aren't there?

A.      I mean, I suppose there are, yeah.

Q.      Okay.  And by using your hands and fingers on the inside, you can't tell how firmly in place the masonry block is that is designed to keep the tee cap from falling out, can you?

15

A.      Well, you can tell to some degree, but you can't quantify it precisely.

(Morse, Exh. "G", pp. 190 – 191).

Morse also relied on an exemplar Tee and cap he purchased in November 2016, and its accompanying instruction sheet:

Q.      Sure.  But the reason that you relied on your exemplar is because you felt that it was identical to the ones in the Paquette residence, right?

A.      That it was substantially similar in the ways that were important.

Q.      Okay.  And one of the ways that the exemplar was important to your analysis was in the way where you say that if you hold the insulated plug in the bottom of the tee connector and let go, friction will not prevent it from falling out; would you agree?

A.      My expert opinions are based at least in part on that, yes.

Q.      Right.  So you got an exemplar, you held it in the normal orientation, you took the tee plug and you put it in the normal place in the normal way, and you let go and it fell out, right?

A.      Yes.

Q.      And based on that activity, you concluded -- based on that activity and the fact that you believed that the tee connector that you were working with was the same as the one at the Paquette residence, you concluded that it was not a friction fit between the tee cap and the connector at the Paquette residence; isn't that true?

A.      I don't know what you mean exactly by the phrase "friction fit."

Q.      I think you used the phrase, that the cap was not held in place by friction. That's what I mean by "friction fit."

A.      So I agree that friction is not sufficient to hold the tee plug in place.

Q.      And do you agree that when you tried to get it to be held in place by friction it -- it failed, it fell out?

A.      That's right, yes.

Q.      And because you felt that you had the right exemplar, you also concluded that the same would have happened in the Paquette connector; is that correct?

A.      I don't think that's quite right.  My opinion is that there was some additional structure that was used to hold the tee plug in place in the Paquette home, and that's based on a number of different things, and one of the pieces of information that that is based on is the result of my test with the exemplar flue pipe.

Q.      Right.  But I want to be specific to your test.  Will you agree with me that you did that test to model the one at the Paquette residence?  That's why it's an exemplar?

A.      I would say to generally model, I wouldn't necessarily expect that the tee plug in the Paquette residence behaves exactly the same way, but it was -- it provided some information as to how the tee and the tee plug fit and their relative geometries.

Q.      Okay.  So let's be specific.  Do you believe that the tee plug in the Paquette residence was held in place in part by friction?

A.      Yes.

Q.      If you did the same thing to the Paquette tee connector and tee plug that you did with the exemplar, would you expect the same result?

A.      I wouldn't expect necessarily the exact same result.  I think that the amount of friction that can be supplied is going to be variable from one specific tee and plug to another, but the conclusion that the friction force is not particularly high, so -- might be variable a little bit from one to the other, but the general conclusion that it's not particularly high I do expect holds for the tee and plug in the Paquette home.

(*Id.*, p. 121 – 125).

    In truth, the exemplar Tee connector and cleanout cap differ from the incident Tee connector and cleanout cap in obvious ways that render the exemplar unreliable.  One example is in the mating surface on the Tee.  The incident connector's mating surface is made of ribbed metal, while the Morse exemplar is smooth.  (Photographs showing the difference are attached hereto as Exhibit "H").

    Furthermore, Morse did not do an adequate investigation to show that his 2016 Tee connector and cleanout were true exemplars.  The purchased Tee came with a set of

Instructions marked as Morse Exhibit #3. He cannot date the publication of the instructions, or say if they are the same as the one that would have accompanied the Paquettes' Tee. (*Id.*, p. 134).

Morse Exhibit #2 is a set of instructions he downloaded from the internet. He cannot date the document or state based on anything but a visual comparison that the instructions applied to the Paquettes' Tee:

Q.      Thank you. Okay. We marked Morse 2. Let me ask you a couple questions about it. When was this published?

A.      I don't know specifically. On the bottom right corner of the last page, there is a numerical indication that may be a date, but I don't want to speculate exactly as to what that means, but perhaps we could search for other versions of this document and establish how Selkirk does document dates.

Q.      That's fine. But as you -- as you sit here today, can you establish a publication date for Morse 2?

A.      So I haven't established a date, and I don't I believe that I can just from this document, but I haven't read every word of the document.

Q.      Can you establish as you sit here today the date of this document from any source, any information?

A.      So when I was searching for this document, I did an Internet search and I found at least two variations that had a slightly different title at the top, but the words were the same in the body of the document, so it seemed like there was at least two different versions that had not changed, but I haven't done a rigorous analysis as to what the dates were for those documents.

Q.      Okay. So again, as you sit here today, can you establish the date of Morse Exhibit 2?

A.      Not specifically.

Q.      And as you sit here today, can you state if the installation instructions that we find here as Morse Exhibit 2 were applicable to the time when the Paquette chimney was installed?

A.      So the product that these instructions refer to has not changed in any noticeable way from the product that was installed in the Paquette home to a

18

product that you can purchase today or I would say that I purchased a few months ago, and so the fact that the products are the same to me is an indication that the instructions regarding the products apply.

Q.     Okay.  So you say the product has not changed.  And what's your basis for saying the product has not changed?

A.     So in November of 2016, I purchased a Metalbestos tee and a Metalbestos straight section, and I examined those and I photographed those and I compared their appearance to photographs of the chimney in the Paquette home, and they appeared to be the same.

Q.     Okay.  Beyond visual appearance, did you make any other comparisons?

A.     No.

(*Id.*, pp. 119 – 121).  Thus, since the Ingalls testimony, the unrepresentative exemplar and the instructions not shown to be like the instructions for the subject Tee, Morse's foundational opinion - that the cleanout cap was in place when the fire started - rests on unsubstantiated data.

Likewise, his corollary opinion that the cleanout cap popped out during the fire has no substantial support.  Morse does not even know how it was secured, much less how or when that securement was overcome.  (*Id.*, pp. 150 – 151, 153).

Even if Morse's opinions about the cleanout cap's being in place at the beginning of the fire and coming out at some point during the fire were to be accepted, his opinions about the fire starting inside the chimney are unsubstantiated.  He opines that the first fuel ignited was creosote caked on the wall of the flue, but he has no information or data about that alleged build-up, even though he admits it is possible to do a quantitative analysis.

Q.     Okay.  So do you have a profile of where there was creosote in the inside walls of the chimney and where there wasn't and how thick it was at different spots?

A.      All right.  So I don't think we know specifically.  I don't know specifically and I don't think anyone knows specifically.  Some of the relevant pieces of information would be that the opening in the flue pipe was sufficiently obstructed that it was affecting the combustion in the stove, so we know it's not just a, you know, millimeter thick.  It's got to be something more significant such that it's actually affecting the flow through the flue.

Q.      So what is the range of thickness that would describe the difficulty that Britain was having in getting a flame going?

A.      I haven't looked at that specifically.  I expect you would need thicknesses, you know, at least half an inch or more.

Q.      And how would you determine that if you wanted to take a scientific approach to determining just how thick the build-up of creosote had to be to explain the problems that Britain was having igniting the log?

A.      Well, I don't think there's any question that the problems that Ms. Paquette was having are related to the build-up of creosote.

Q.      Right.

A.      If you wanted to quantify that in some way, you would do a flow analysis through the flue pipe.

Q.      And you haven't done that here?

A.      I have not.

Q.      So in terms of that flow analysis, would that enable you to state with reasonable certainty in your field how much -- how thick the creosote was at various points in the flue?

A.      It may.  The difficulty is you have to compare the subjective experience of Mrs. Paquette and her description of her subjective experience with the actual fluid mechanic results of different amounts of build-up.[10]

Q.      But you can do that with simulations and varying degrees of thickness and you could get results as to the fluid flow through that chimney, right?

A.      So you could calculate the volume flow rate of air through the chimney as a function of the degree of obstruction in the flue pipe.  The other variable you

---

[10]      Here and elsewhere, Morse expresses concerns about using the Paquettes' "subjective experience" in his analysis.  Notably, when it comes bolstering his own opinions, such as saying that her problems igniting the log show a creosote buildup, he freely uses their subjective experiences.

would need to know is the temperature in the stove, and then really you're getting a measure of the obstruction to the flow, but you wouldn't necessarily know how that's distributed.  So you wouldn't know if there was a mild obstruction throughout the entire length of the chimney or whether most of the chimney was absolutely clear but there was just a stronger obstruction in one location.

Q.      Okay.

A.      So you would know the overall fluid mechanic properties of the obstruction, but you might not know the specific distribution.

Q.      But could you give a better range of the thickness of the creosote build-up if you had done that analysis?

A.      I think that analysis would provide information that -- that may help provide a more precise quantification on the creosote build-up.

(*Id.*, pp. 67 – 70).  While conceding that creosote was more likely to accumulate at the top of the chimney where it is colder, he could not specify how far down the chimney the creosote extended.  (*Id.*, pp. 74 – 77).  The combination of not knowing (1) the drafting conditions that would draw sparks or embers upward to, but not beyond caked-on creosote and (2) the lowest extent of the creosote demonstrates that Morse does not have cohesive proof that ignition occurred as he says.

Nor is Morse able to compare the alleged creosote build-up at the time of this fire with any prior creosote build-ups in the subject chimney.

Q.      Okay.  So you'll agree with me that you made no attempt to compare the degree of creosote build-up on the inside of the flue at the time of this fire with the degree of creosote build-up on the inside of the flue at the time -- in the winter when they needed their second cleaning, right?

A.      I didn't make a quantitative comparison.

(*Id.*, p. 74).  Indeed, his opinions do not account for the testimony of both homeowners that in the days leading to the fire, their woodstove had trouble heating to the desired

temperature. (Paquette, Exh. "A", p. 46); (Lencki, Exh. "B", p. 67). Thus, he cannot explain why this creosote build-up would have led to a fire while no prior build-up had.

Morse's next opinion is that the fire spread beyond the supposedly closed and capped chimney to an outside combustible material. His opinions on this spread likewise have no basis in fact or data. He has done no testing whatsoever. He offers alternately no temperatures and times, or overly wide ranges of temperatures and times. And he has no basis for comparing the subject alleged chimney fire to the designed-in capacity of the Paquettes' chimney to contain heat from a foreseeable chimney fire.

Asked what the temperature of the creosote fire was, he states: "I haven't made that determination," and concedes that there are sources of such information but he has not consulted them. (*Id.*, pp. 79, 83). When pressed for a range of temperatures, he offers between 1,000 and 2,000 °F, a whopping 1,000 °F range. (*Id.*, p. 79).

He states that heat was transferred from the alleged creosote fire by convection and conduction, but when asked to quantify the amount of heat transferred by each, he admittedly could not be more specific than saying more than 50% of the heat is convected upward through the flue, a 50% range. (*Id.*, pp. 86 – 87). His means of ignition of the combustible materials outside the chimney is heat transfer by conduction through the two walls and the insulation between them, and the minimum 2" air gap between the outside wall of the chimney and the combustible, but he cannot quantify the rate of conduction:

> Q. Does a double-walled, insulated flue pipe also tend to inhibit heat transfer by conduction as opposed to a single-walled pipe?
>
> A. Yes. The rate of conduction's going to be lower through a double-walled, insulated flue pipe than through a single-walled flue pipe.

Q.      And can you quantify that difference in the rate of conduction?

A.      I mean, that's something that could be quantified if you knew the specific geometry and the materials involved.

Q.      Have you done that?

A.      I have not done that.

Q.      And have you done anything to determine how a fire burning at a given temperature inside the flue pipe would translate into the heat on the outside of the flue pipe by conduction?

A.      So, I mean, I know as a matter of engineering principles that heat's going to be conducted from the inside to the outside and the outside surface of the flue pipe is going to warm up as a result of the fire on the inside, but I have not performed a quantification of that.

Q.      Okay.  I think you said that the creosote burns in this case between 1,000 and 2,000 degrees Fahrenheit, so can you give me a range of surface temperatures on the outside of the Paquette flue pipe at the time the creosote fire was occurring?

A.      So I haven't done a specific quantification.  I expect that it would be in excess of several hundred degrees Fahrenheit.

Q.      The range?  I wanted a lower and an upper limit, so I'm not sure if you gave me both.

A.      So I said in excess of several hundred degrees Fahrenheit, so that would be a lower bound if you like, and an upper bound would be the actual temperature of the fire inside the chimney, so the upper bound would be 2,000 degrees Fahrenheit.

Q.      So the outside temperature could actually equal the inside temperature?

A.      No.  It would have to always be less than.

(*Id.*, pp. 89 – 90).

He did nothing but read the installation instructions to educate himself about how effective the metalbestos chimney was at containing chimney fires, *i.e.*, preventing them from spreading to outside combustibles as he theorizes here:

Q.      I guess I'm asking a slightly different question, which is, Is the clearance meant for -- to prevent nearby combustibles from igniting under normal fire conditions, or was it specified to anticipate abnormal fire conditions, such as a chimney fire?

A.      Right.  So I expect that the -- the separation requirements are looking at not just normal operation but some amount of abnormal operation, and when you're designing a product, you make a reasonable determination of what range of out of the ordinary conditions you should be considering.  So I don't know specifically what range of abnormal conditions were considered in the design.

Q.      And you didn't investigate that as part of this case?

A.      I reviewed the installation instructions.  They have specific warnings about chimney fires, so I think that is relevant to an understanding of how the product was designed.

Q.      Okay.  But I guess what I'm asking is, Did you research to find out exactly how much time Selkirk Metalbestos meant to buy the homeowner to find out about and deal with a chimney fire before the specified clearance was going to break down and allow the fire to ignite outside combustibles?

A.      I don't imagine that's how Selkirk thought about that, because the timing is going to be so dependent on so many factors that that's not a reasonable variable for them to, you know, be focusing on solely when they're designing their product.

Q.      You don't think the abnormal condition of a chimney fire entered into the analysis of how much clearance they specified?

A.      That's not what I said.  I think they did consider that.

Q.      Okay.  And so that's what I'm saying is, When they considered it, did you do any research to find out what their consideration was?

A.      I would say yes in that I read the installation instructions.

(Id., pp. 102 – 104).

He is unable to quantify the heat outside the chimney during a normal woodstove fire, let alone when there was a creosote fire in the chimney.  (Id., p. 99).  Nor can he identify or state the ignition temperature of the combustible material outside the chimney that first ignited in his scenario.  (Id., pp. 96 – 97).

24

His opinions are the epitome of bootstrapping.  He starts with the conclusion he knows is favorable to A+, *i.e.*, that the fire started inside the chimney, then he posits that the extension of the fire outside can only be because the heat transferred to some other unidentified combustible.  But he cannot offer any reliable data from which he reaches this conclusion.

Morse's origin and cause opinions also suffer from a lack of specificity.  He posits a chimney fire, but cannot provide specificity as to when it started, how long it took to spread to combustibles outside the chimney, or when the chimney fell and the cleanout cap somehow became dislodged.  Without this information, he cannot correlate his opinion with the timeline established in the record.

The following is an example of his lack of specificity coupled with an admission that he chose not to do a more detailed analysis:

> Q.      Okay.  So we know when the occupants of the Paquette house first learned of the fire, but I want to know if you have an opinion as to how long before the fire first showed to the occupants it actually started.
>
> MR. HEATH:  Object to the form of the question.
>
> A.      I don't have a specific minute-by-minute timeline.  I believe the fire in the chimney occurred at some point while Mrs. Paquette was attempting to -- performing multiple attempts to ignite the fire in the stove.
>
> Q.      And do you have an opinion as to how much time elapsed from when the fire in the chimney first started to when the occupants were alerted to it?
>
> A.      So I don't have an exact duration, but I expect it's something less than an hour.
>
> Q.      Okay.  So that is the longest it could have been.  Can you give me the shortest it could have been?
>
> A.      Again, it may have been as short as several minutes, maybe something like ten minutes.

Q.      What's your basis for that?

A.      The sequence of events is that there was a chimney fire and then that chimney fire ignited combustible materials on the outside of the chimney and that fire spread throughout the house.

Q.      Right.

A.      And the fire was not noticed until it had spread to outside of the chimney, so until the chimney fire had ignited combustible materials on the outside of the chimney, and then that fire had spread sufficiently such that smoke was noticed in the living room.

Q.      All right.

A.      And I haven't performed a detailed analysis of that timing, but I expect that it would take at least several minutes.

(*Id.*, pp. 65 – 66).

Morse is equally vague about whether his chimney fire scenario would cause the

stovepipe in the living room to heat up and glow red.

Q.      And have you made any determinations in this case as to the exact location of the chimney fire?

A.      So I've come to a conclusion regarding the location of the chimney fire, and you used the word "exact," and so I don't know exactly what you mean by that word.

Q.      Well, how precisely can you describe the location of the chimney fire when it first started?

A.      Right.  So I describe the chimney fire as being inside the chimney.  That's the vertical section of the flue piping that's above the office ceiling in the Paquette home.  And I'm not more specific as to exactly the vertical location in the chimney where the fire first occurred.

Q.      So anywhere in that 13-foot vertical stack is where you say the fire started?

A.      Yes.  The chimney fire started somewhere in that vertical section of flue piping.

Q.      Okay.  And based on that opinion, can you state whether or not the stovepipe appearance would reflect the fact that there was a chimney fire?

A.      I have not done the analysis, but based on the timing, I expect that the stovepipe would not have gotten hot enough to be glowing.

Q.      What analysis would be involved in determining that definitively?

A.      That would require a heat transfer analysis you would use to calculate the surface temperature of the stovepipe.

Q.      And you haven't done that analysis?

A.      I have not done that analysis.

(*Id.*, pp. 55 – 56).  This is a crucial omission on Morse's part, because it exposes a gap in the "fit" between the facts and his fire scenario.  Had he undertaken the heat transfer analysis and determined that this fire would have caused the stovepipe to glow red, his chimney fire scenario would conflict with the fact that no one observed that.  By foregoing the analysis, he uses speculation to supply this important fact.

### b.      Compliance with National Standard, State Law

Morse's opinions about Ingalls' compliance with NFPA 211 and Vermont law are likewise unfounded.  He concedes that Ingalls was required to conduct a Level I inspection, and that Ingalls was not aware of the requirement.  Nonetheless, he says that Ingalls actually performed a satisfactory Level I inspection anyway.

His report includes the following opinions exonerating Alton Ingalls for his failure to inspect and confirm the tightness of the cleanout plug:

6.      The actions of Mr. Ingalls of A+ Chimney Service during the cleaning of the flue piping in November 2013 were in accordance with the requirements in NFPA 211 for a Level 1 inspection.

7.      A+ Chimney Service was not required to access the concealed exterior portions of the chimney flue in the Paquette home during the cleaning and Level 1 inspection.

27

(Morse Report, p. 3)(pertinent portions of the Report are attached hereto as Exhibit "I").

Morse summarizes Ingalls' cleaning procedure as follows:

> His procedure was to first access the chimney flue from the roof and use a brush to clean out the entire vertical length of the chimney flue. The creosote and soot that had accumulated on the inner walls of the flue pipe would have been dislodged by the brush and collected at the base of the tee. Mr. Ingalls then went inside the home and removed the sections of flue piping in the living room to clean them. Mr. Ingalls could then clean the 18-inch long horizontal section of the flue piping that passed through the living room wall. Mr. Ingalls could also access the base of the tee through this horizontal section and remove any debris at the base of the tee that had been dislodged by the cleaning process. In this way, Mr. Ingalls was able to access and clean the entire length of the flue piping. As part of the cleaning process, Mr. Ingalls also inspected the entire length of the flue piping visually using a flashlight. Mr. Ingalls could also see and feel the plug at the base of the tee to confirm it remained in place.

(*Id.*, p. 10).

As to the standard of care for the chimney cleaning, Morse offers conflicting testimony about whether a chimney sweep who knows of a cleanout cap should use it for its eponymous purpose. First, he says he would expect the chimney sweep to "understand the configuration" and the possible ways to clean out the debris that fell into the Tee. (Morse, Exh. "G", pp. 184 – 185). But Ingalls admitted to doing nothing to "understand the configuration"; he cleaned out this Tee from the inside because that is how he cleaned out all Tees. (Ingalls, Exh. "C", pp. 17 – 18). Despite presuming that Ingalls made an informed choice to clean the Tee without removing the cleanout cap, Morse advances an interpretation of NFPA 211 that did not require Ingalls to understand the configuration:

> Q.     Okay. Is there anything in Chapter 13 that says whether or not it is the standard of care for someone cleaning a Metalbestos chimney that they should clean out a cleanout tee by removing the removable cap or not?

A.      Chapter 13 does not say you need to remove the cap or plug for a cleanout tee to perform cleaning.

Q.      It doesn't say whether the standard of care requires that or not, does it?

A.      It doesn't say either way, so the interpretation is that it's not a requirement since it's not -- at least not a requirement according to NFPA 211.

Q.      So that's your interpretation, that because it doesn't specifically say in the "Maintenance" chapter that you have to remove cleanout plugs, that therefore that is not consistent with the standard of care?

         MR. HEATH:  Object to the form of the question.  But if you can answer it, go ahead.

A.      I don't think there's anything in NFPA 211 that requires that you remove a plug or cap on a tee to perform a cleaning of the chimney system.

Q.      And is there anything in NFPA 211 that says that you do not have to remove a cap or a tee?

A.      I think the fact that it doesn't say that you have to implies that you do not have to.

Q.      But will you agree with me that there is nothing specifically and explicitly in 211 that says that you do not have to remove a plug from a tee as part of a cleanout of a chimney?

A.      I don't see that in Chapter 13.  I don't believe that's anywhere else in the document, but I haven't reviewed the entire document, but I think it would be silly to expect the code to lay out everything that you don't have to do.

(Morse, Exh. "G", 30 – 31).  The Code does not specify *whether or not* removable cleanout caps should be removed for their eponymous purpose, but Morse nonetheless reaches his own baseless interpretation that NFPA 211 makes such a choice and comes down on the side of not requiring the sweep to remove the cap for cleaning.  If Morse was doing something more than reading and interpreting NFPA 211 for the first time, his interpretation might have weight, but he conceded that he had never read Chapter 14 before he was hired in this case.

Chapter 14 of NFPA 211 requires routine cleanings to include a Level I inspection. (Morse Report, Exh. "I", p. 11). The parties agree that a Level I inspection applies only to "readily accessible portions of chimney exterior and interior; accessible portions of appliance and chimney connection." (Morse Report, Exh. "I" p. 11, showing NFPA 211, Chapter 14, Table 14.2.1). Ingalls' fateful violation of the Code and Vermont law is that, despite knowing there was a cleanout cap, he made no attempt to see if it was "readily accessible" for inspection. Ingalls testified:

> Q.     What would your inspection have encompassed, if they asked you to do one?[11]
>
> A.     Same thing. Inspect the interior of the metal asbestos, stovepipe; make sure the connections are all good. Any access to the metal asbestos, whether it be -- most metal asbestos are run on the outside of the house, so you are looking at everything.
>
> Q.     At the Paquettes', though, the metal asbestos was run partially inside the house, right?
>
> A.     Correct.
>
> Q.     So if you had been called upon to inspect the Paquettes' metal asbestos chimney before the fire, what would you have done to inspect the portion of the metal asbestos chimney that was inside the house?
>
> A.     *I would ask to see where it came through; where the tee was upstairs.*
>
> Q.     What would you have been looking for?
>
> A.     The metal asbestos chimney.
>
> Q.     With regard to the tee, what kind of inspection would you have done on that?
>
> A.     Make sure it was secured.

---

[11]     Despite being unaware of the legal requirement to conduct a Level I inspection with every routine cleaning, Ingalls offered his customers an inspection as an option for an additional cost.

Q.      When you say make sure it was secured, what are you making sure is secured?

A.      There should be a bracket that sits there at the bottom of the tee, to support it; to support the whole metal asbestos chimney.

Q.      Would it have been part of your inspection at the Paquette residence, had you been hired to do an inspection, to make sure that the clean-out cap was accessible?

A.      I have never seen one not accessible.

          *              *              *              *

*Q.      Did you ever say anything to the Paquettes about the fact that it was unusual that you could not access the clean-out cap on the tee from the outside?*

*A.      I did not know you couldn't.*

*Q.      And did you ever ask to be able to see if you could or couldn't?*

*A.      No.*

Q.      You didn't know, and you didn't need to know?

A.      Correct.

(Ingalls, Exh. "C", pp. 21 – 24)(emphasis added).

Morse acknowledged that at a minimum, a sweep doing a Level I inspection was required to determine what was "readily accessible"; how else could the inspector inspect "readily accessible" portions of the chimney?

Q.      So did Mr. Ingalls testify that he knew that there was a tee with a removable cap on the other side of the living room wall from the wood stove?

A.      I mean, I think that's right.  I just don't remember every detail from his deposition.

Q.      Okay.  If he knew there was a removable cap, then how could he determine if that removable cap was readily accessible or not?

          MR. HEATH:  Object to the form of the question.  Go ahead.  You can answer it.

A.      Well, he was able to access the inside of it, and he was not able to access the outside of it without removing a wall.

Q.      How does he know that, that he -- how does he know that he can't access the outside of it from his vantage point on the roof or his vantage point in the living room even after removing the stovepipe from the chimney connector?

A.      I don't -- I don't know for sure.  I think there's a number of ways that he could have learned that, but I don't know specifically which was the way that he learned that.

Q.      Name the ways.

A.      He could have talked with the Paquettes to understand the configuration in the home.

Q.      Okay.

A.      And he could have done a walk-through of the home --

Q.      Okay.

A.      -- to understand the configuration of the rooms and the walls and the chimney.

Q.      Okay.  Can you think of any other ways that he could ascertain whether he could access that tee plug other than talking to the Paquettes or doing a walk-through of the home?

A.      I mean, there may be other ways.  I can't think of any at the moment.

(Morse, Exh. "G", pp. 159 – 160).  Ingalls never even reached first base, *i.e.*, he never inquired or looked to see if the cleanout cap was readily accessible for inspection.

Morse strains to excuse Ingalls by advancing unsupported, self-serving interpretations of NFPA sections.  NFPA §13.5 states:  "After any inspection or maintenance operation, cleanout doors and caps or plugs for cleanout tee fittings shall be closed tightly or secured in place."  The plain language of this provision does not confine itself to situations where the cap had been removed – it refers to "any inspection or

maintenance operation." It mandates a final check of such caps to make sure they are closed tightly or secured in place. This is an obvious recognition that such components can become loose over time, not just during that cleaning. Morse offers a tortured alternative interpretation:

> Q.     Okay. So even if you clean out a tee without taking out the plug, you still have to check if it's closed tightly or secured in place, correct?
>
> A.     Not necessarily.
>
> Q.     Okay. So why don't you explain that to me, because I'm a little confused about it.
>
> A.     Well, depending on a specific chimney configuration, you may be accessing different parts of it in different ways, and so you might have to open a cleanout door or cap or plug in order to access a certain portion of the chimney, in which case this section would apply, but if you didn't need to do that, then you wouldn't need to close a cap tightly because you never opened the cap.
>
> Q.     Okay. So let's parse this a little bit, if we can. Section 13.5 applies to inspections as well as maintenance operations, right?
>
> A.     Yes.
>
> Q.     So stay with me and let's talk about if an inspection is done and not any maintenance operations, okay? Do you understand?
>
> A.     Yes.
>
> Q.     Okay. So it says, "After any inspection ... caps or plugs for cleanout tee fittings shall be closed tightly or secured in place." Would you agree with that?
>
> A.     I agree that that's what the code says.
>
> Q.     Okay. And an inspection does not necessarily include removing a cap or a plug for a cleanout tee fitting, does it?
>
> A.     It may or may not. It depends on whether the person doing the inspection needs to remove a cap or a plug in order to inspect a portion of the chimney.
>
> Q.     Right. And Section 13.5 doesn't get to that level of detail, right?

MR. HEATH:  Object to the form of the question.   If you can answer it, go ahead.

A.      I mean, I'm not sure I understand what you're asking.  I think the language in 13.5 is what it is.

Q.      Well, you're interpreting other language in the code, and I want to get your interpretation of this language in the code.  Isn't the purpose of 13.5 to make sure that when the maintenance and inspections are done, that a final check be done to make sure that a plug or a cleanout is closed tightly or secured in place?

A.      After you've done an inspection or performed maintenance, you want to make sure that the chimney is tight, so if you've opened any part of the chimney, you want to make sure you close that up.

Q.      Okay.  13.5 does not say that you should only check for a plug for a cleanout tee to be closed tightly or secured in place on those occasions where you've opened it, does it?

A.      Well, if you haven't opened it, then you wouldn't need to close it.

Q.      That's true, but that's not what this says.  It doesn't say you need to close it.  It says you need to make sure it's closed tightly or secured in place.  So that's just an additional check, isn't it?

A.      It says "cleanout doors and caps or plugs for cleanout tee fittings shall be closed tightly or secured in place."

Q.      Right.  And you're saying --

A.      It doesn't say that if you haven't opened a cleanout door or cap or plug, if it's already closed, that you have to perform some test or verification on how tightly it's closed.  It doesn't say that.

Q.      It also doesn't say that you only have to check that it's closed tightly or secured in place on those occasions when you've opened it or unsecured it, does it?

A.      It says that the cleanout doors and caps or plugs for cleanout tee fittings shall be closed tightly.

Q.      Or secured in place.

A.      Right.

34

Q.      And it doesn't say whether that should happen only if you've opened it; would you agree with that?

A.      It doesn't have those words, that's right.

(*Id.*, pp. 27 – 30).  Morse's unsubstantiated, narrow interpretation of §13.5 is in conflict

with the NFPA's stated purpose for requiring inspection with routine cleanings:

Q.      Well, let's see if you'll agree with me.  Are routine cleanings basically annual?

A.      Yes, I think that's generally correct.

Q.      Okay.  So one year after you've had your chimney installed, you'll get your routine cleaning, right?

A.      Yes.  Something like that.

Q.      And even though the chimney has only been there for a year, that cleaner still has to do a Level I inspection, right?

A.      Yes, I agree with that.

Q.      Okay.  So even only one year out from the initial installation, NFPA 211 wants the chimney cleaner to verify the suitability of the chimney or the flue for continued service under the same conditions and with the same or similar appliance or appliances, right?

A.      That's my reading of Chapter 14, yes.

(*Id.*, pp. 189 – 190).

For this case, Morse has done no research beyond reading NFPA 211 and the

Vermont State materials showing that it was adopted into law.  (*Id.*, pp. 22 – 23).  Thus,

he has no reliable basis for his self-serving interpretations of the language.

Morse also ventures opinions on chimney cleaning.  It is acceptable, Morse

opines, to ignore the removable cleanout cap and clean the base of the Tee instead by

reaching in with a hand, although he concedes that cleaning by feel may not be as

effective as removing the cap for cleanout.  (*Id.*, p. 186).  He also ventures that Ingalls

could feel if the cap was in place, but concedes that he cannot thereby discern how firmly secured it was.  (*Id.*, pp. 190 – 191).

**B.**      **A+'s Damage Experts**

The Paquettes were insured for their losses by plaintiff Nationwide.  Nationwide evaluated their fire loss and paid them $438,264.65.  Two components of the payments are pertinent herein:  the building repair cost of $273,946.00 and the personal property payment of $123,241.39.  Defendant seeks to counter Nationwide's valuation by disclosing two valuation experts of its own – a real estate appraiser to counter the repair cost valuation and a personal property appraiser to oppose Nationwide's personal property valuation.[12]

**1.**      **Real Estate Appraiser Mark Lareau**

A+'s real estate appraiser is Mark Lareau.  He prepared two retroactive appraisals of the property – one before the fire and one after – for the diminution in value calculation.  The "before" value is the minuend and the "after" value is the subtrahend in the subtraction equation that produces the diminution in value.  (A copy of his "before" valuation is attached hereto as Exhibit "J").

**a.**      **"Before" Value**

While real estate appraisals can be an amalgam of three different approaches – cost, sales and income - Lareau's "before" value is based on only one, the sales

---

[12]      The legal basis for A+'s opposition to Nationwide's damage figures is discussed in the Argument section below.  For purposes of this motion only, Nationwide does not object to the notion that under Vermont law, there can be more than one valuation method, but it staunchly opposes A+'s proffered alternative valuations based on lack of qualifications, foundation and fit.

approach.[13]  (Lareau, p. 24)(pertinent portions of the Lareau deposition are attached hereto as Exhibit "K").  The sales approach considers sales of other property deemed comparable to the subject property.  (*Id.*, p. 28).  To the extent the other properties differ from the subject property, the appraiser can make adjustments to reach a more representative comparison of sale price to the value of the subject property.  (*Id.*, pp. 28 – 30).  Thus, Lareau admits that his "before" valuation relies heavily on (1) his choice of property sales he deemed "comparable", and (2) the quality of his adjustments to those sales to account for salient differences between them and the subject property. Unfortunately, he misses the mark widely on item (2).

Lareau chose four prior sales to compare to the subject property.  This motion demonstrates his lack of a sufficient factual basis for his adjustments to bring them into line with the subject property.  Comparable sale #2 is notable for two reasons.  First, in a locale where his Report states that the average marketing time for a property is 3 – 6 months, it sold in only 9 days.  Before issuing his report and giving his deposition, he did nothing to investigate why it sold in only 9 days.  (*Id.*, pp. 46 – 47).  Had he conducted such an investigation, he could have determined if the short marketing period meant that it sold at less than market value.  (*Id.*, pp.47 – 48).  If he had ascertained that it had sold in only 8 days for the original listing price, he agrees there was a possibility that the sale price was low.  (*Id.*, p. 50).

---

[13]     Lareau eschewed the cost approach, which starts with the replacement cost of the property reduced by depreciation, because he deems the depreciation of building components to be "very subjective."  (Lareau deposition, p. 25)(pertinent portions of the Lareau deposition are attached hereto as Exh. "K"), He rejected the income approach because few properties in the area are rented and therefore, there is no market rental rate.  (*Id.*, p. 24).

Lareau also conceded that a simple telephone call to the listing agent would assist him in ascertaining the circumstances that led to the abnormally short marketing time.

> Q.     Okay.  So when you do a valuation, you have the MLS available to you on the computer, right?
>
> A.     Yes.
>
> Q.     Are you able to contact listing agents as part of a fair market value appraisal?
>
> A.     Yes.
>
> Q.     In this case, did you contact any listing agents?
>
> A.     I don't believe I did.
>
> Q.     Have you done that in doing appraisals in the past?
>
> A.     Yes.
>
> Q.     How often do you contact listing agents for the comparables that you are using?
>
> A.     Not very often.
>
> Q.     When you do it, why do you do it?
>
> A.     Because there appears that there's something possibly -- something doesn't appear right.
>
> Q.     Okay.  And do you think it might have been beneficial to contact the listing agent for comparable sale number 2 in this case?
>
> A.     It would not have been -- yes.
>
> Q.     Would it have been beneficial to contact the listing agent for comparable sale number 2 in this case?
>
> A.     Yes.

(*Id.*, pp. 52 - 53).  He made no attempt to do so and as a consequence, he cannot say if Comparable property #2 sold for fair market value.  (*Id.*, pp. 47 – 48).

Nearly four weeks after his January 12, 2017 deposition, defense counsel sent an email to plaintiff's counsel on February 8, 2017 to advise plaintiff that "Mr. Lareau followed up on several items" raised in his deposition.[14]  (A true and correct copy of the email together with plaintiff's counsel's reply is attached hereto as Exhibit "L").  Among the items addressed in the email was the abnormally short marketing time for Comparable sale #2, about which defense counsel said:

> Mr. Lareau spoke with appraiser Bill Young regarding the sale of Comp 2, 615 Kings Hill Road Bakersfield, VT which sold in 9 days.  Mr. Young learned that the sale of this property was an arm's length transaction; did not involve a motivated seller and was not a short sale.

(Exh. "L").  With the email, A+ produced the MLS listing for the property.  The MLS listing was not produced with the original disclosure and was not produced in response to the *duces tecum* clause in the Notice of Deposition.  The belated production shows that the list price was $199,000 and the closing price was $192,000.  Plaintiff has no opportunity to question Lareau before trial regarding this factual scenario.

A+'s attempt to "supplement" is unavailing even if were timely.  Lareau spoke not to the original listing agent, but rather to another appraiser named Bill Young.  Young has not been identified as an expert or a fact witness.  It is not clear where Young obtained the information or if it is accurate.

---

[14]    Plaintiff's counsel promptly objected to the late disclosure of materials relied on by Lareau. A+ defended it as seasonable supplementation under Rule 26(3). (*Id.*) This is incorrect.  Seasonable supplementation applies to *new* information; it does not apply to information relied on but not disclosed or new opinions: "Although Fed.R.Civ.P. 26(e) requires a party to 'supplement or correct' disclosure upon information later acquired, that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report...."  Lindner v. Meadow Gold Dairies, Inc., 249 F.R.D. 625, 639 (D.Hawai'I 2008)(citation omitted).  See also In re Asbestos Products Litigation (No. VI), 289 F.R.D. 424, 425 (E.D.Pa. 2013)("Rule 26(e) is not an avenue to correct 'failures of omission because the expert did an inadequate or incomplete preparation', add new opinions, or 'deepen' or 'strengthen' existing opinions")(citations omitted).

Second, Comparable sale #2 was deemed better than the subject property because it had two detached sheds while the subject property had none.  He valued the sheds collectively at $3,000, based on their size.  (*Id.*, p. 79).  However, when asked his basis for the $3,000 offset for the sheds, he conceded that he had no factual basis.  He relied on only two sources of information for assessing the comparable sale properties:  a review of the MLS listing on the computer, including photographs, and a drive-by observation of the property.  (*Id.*, pp. 79 – 83).  For Comparable sale #2, he had no recollection as to whether the MLS listing provided any pertinent information about the sheds.  (*Id.*, pp. 80, 82).  He could not recall if either or both of them were visible, wholly or partially, from the street.  His testimony illustrates his willingness to assign a value based on little or no information, even though information was available:

> Q.      Okay.  So I think what you've done was explained to me the general procedure that you use to value a detached shed, but I want to get down to the specifics of comparable number 2.  How did you value the two sheds in comparable number 2 and give them -- assign them a $3,000 value?
>
> A.      I believe I answered that, but --
>
> Q.      You just used that same procedure?
>
> A.      Yes.
>
> Q.      So what I want to know, though, is what do you recall about those sheds, as you sit here today?
>
> A.      Not a lot.
>
> Q.      Okay.  What were they made of?
>
> A.      Wood.
>
> Q.      And do you have an estimate for their footprint?
>
> A.      I do not.

Q.      Do you know what use was made of them?

A.      Not at this time.  When I did the report, I knew what more or less the sizes were, whether they were 8.8 or 12 by 12 or 12 by 30, but, again, between pictures from the street and pictures on MLS, sometimes you -- you have this information when you do the report.  I did this report in November.

Q.      But you don't know how many MLS photos you had on this property, do you?

A.      No, I don't.

Q.      Do you know if any of those photos showed the detached sheds?

A.      I do not.

Q.      The one photo that you have of comparable number 2 in your report, does it show the detached sheds?

A.      No, it doesn't.

Q.      And do you know if the sheds had their structural integrity?

A.      I believe they did, but if I was going to say yes or no, I'd say no.

Q.      Okay.  And from the street did you get a full view of either or both sheds?

A.      I do not recall at this time.

Q.      And of course you didn't speak to the current owner of comparable sale number 2?

A.      No.

Q.      And so you didn't obtain any information from anyone who had knowledge of the condition of those sheds?

A.      No, I didn't.

(*Id.*, pp. 81 – 83).[15]

---

[15]      Lareau did not attach photographs of the sheds to his report.  Nor did he bring the photographs or other materials on which he relied to his deposition, despite being requested to bring his entire file.

In its related attempt to supplement by email dated February 8, A+ produced the MLS listing for this property.  The description reflects the presence of "2 storage sheds" and includes a photograph of each.  Because of the late production of materials on which Lareau relied, plaintiff is prejudiced because it cannot question Lareau further on this subject.

Comparable sale #4 is the only one that, according to Lareau, had a "hearth" like the subject property.  He valued the Paquettes' hearth at $4,000, and because Comparable sale #4 also had a hearth, he considered the two hearths to be equal in value.

> Q.      Okay.  If we look at comparable sale number 4, you made no adjustment for the fact that the subject property has a hearth, because you list that comparable sale number 4 has a hearth as well, right?

> A.      That's correct.

> Q.      What can you tell me about the hearth at comparable sale number 4?

> A.      I can't tell you very much at this point in time.  I can tell you that I determined that it was comparable in value, but without the pictures and everything else, I really can't tell you much more.

> Q.      Okay.  Can you tell me what your basis was for determining that the hearth in comparable sale 4 was comparable in value to the hearth in the subject property?

> A.      By observing the pictures in this report that I was able to pull up and the pictures that were provided in the Multiple Listing Service.

> Q.      Okay.  So that was your process, but what I'm asking is, having used that process, what were the things that you gleaned about comparable sale 4 that led you to say that the hearth there was of comparable value to the hearth at 1052 Main Street North?

> A.      It was my proposal professional opinion.

> Q.      And that's a subjective opinion?

> A.      Yes.

Q.      And it's based on -- purely on photographs?

A.      Yes.

Q.      And no additional information other than what you could glean from a photograph?

A.      Yes, that's correct.

Q.      And as you sit here today, can you tell me if any of the photographs that you looked at for comparable sale number 4 actually included the hearth in them?

A.      I am pretty certain that they did.

Q.      And how many?

A.      I do not know.

Q.      What is your recollection of what the hearth looked like in comparable sale number 4?

A.      I do not remember.

Q.      Was it just a floor hearth, or did it also have a wall component to it like the comparable –

A.      If it was just on the floor, we wouldn't have mentioned it.

Q.      Okay.

A.      So it was on the wall.

Q.      And do you know how high up on the wall it was?

A.      I do not.

Q.      Do you know what material it was comprised of?

A.      I do not remember.

Q.      Do you know the condition of the hearth wall?

A.      No.

(*Id.*, pp. 83 – 85).[16]  Lareau could not say whether Comparable sale #4's hearth was truly comparable to the Paquettes'.

In the February 8 follow-up email, A+ produced the MLS listing for this property, including a photograph showing a brick wall behind a woodstove.  Again, due to the belated disclosure, plaintiff is prejudiced because it cannot question Lareau about this subject.

Lareau also baselessly failed to consider various unique qualities of the Paquette home to be value-enhancing.  These included (1) cathedral ceilings, (*Id.*, p. 75), (2) a two-story wall of windows overlooking an attractive stand of trees and, in the winter, a valley view, (*Id.*, pp. 32 – 33, 76), (3) an extra-long setback from the road, (*Id.*, p. 33), and (4) a privacy-enhancing stand of trees between the road and the house.  None of the four comparables had any of these features, but Lareau made no adjustments to reflect these differences.  He did not even do any investigation into whether buyers would be willing to pay more for such features as cathedral ceilings and a wall of windows.  (*Id.*, p. 76).

Finally, Lareau admittedly failed to consider information he acknowledged to be relevant.  He conceded that if another appraiser did more than one appraisal of the subject property, he would find the appraisals significant.

> Q.    Okay.  So I guess what I'm asking is would looking at prior appraisals, prior to the date that you were doing an appraisal of this property, enable you to track the recovery of the value of this particular property that you're appraising?
>
> A.    If they had all been done by the same individual, I would say that there could be something that would be relevant.  But when you have three appraisals by three different appraisers, that we discussed earlier, I would rely more -- that

---

[16]    Lareau did not attach the MLS photographs or other materials to his report. Nor did he bring them to his deposition in response to Plaintiff's request for him to bring his entire file.

there would be more consistency if it was the same appraiser who did all three of those appraisals than three different appraisers.

Q.      Okay.  If the same appraiser did, say, two appraisals, would you note and take into consideration any change in value between those two appraisals?

A.      I would note the difference.

Q.      Okay.  And you certainly wouldn't ignore or reject the difference, would you?

A.      No.

Q.      You didn't get any prior appraisals before you did yours, right?

A.      No, I didn't.

(*Id.*, pp. 41 – 42).

The discovery record in this case shows that William J. Young of Young Appraisals valued the Paquette property twice, on September 8, 2011 and November 3, 2014.  His 2011 appraisal was $225,000 and his 2014 appraisal was $276,000.  (Copies of the 2011 and 2014 appraisals are attached hereto as Exhibits "M" and "N", respectively).  Lareau's appraisal of the value in 2014 was only $210,000, substantially below Young's 2011 appraisal and even farther off from Young's 2014 appraisal.  By his own admission, if Lareau had been given these appraisals he would have used them.  His failure to consider available information, therefore, undermines the foundation for his "before" appraisal.

### b.      "After" Value

Lareau's "after" value is equally if not more baseless.  After the fire, the Paquette property was not virgin land; it was a tract with a burned-up structure resting on a questionable foundation.  Yet, Lareau admittedly treated it as though the burned-out hulk had already been demolished and carted away and the remaining foundation had been

professionally evaluated and found to be re-usable. (Lareau, Exh. "K", pp. 87 - 88). He also assumed without basis that the utility lines could be re-used without an evaluation and/or repair or replacement, and that any damage to the landscaping due to the demolition had been remedied. (*Id.*, pp. 90 – 91). He gave no consideration to the cost of these items in his "after" value, even though a putative buyer would need to incur them. (*Id.*, p. 91).

The "after" value, like the "before" value, also relied solely on the sales approach, making the choice of comparable sales and the adjustments to them paramount in assessing their reliability. Lareau used four prior sales. Not one of them was a plot of land with a foundation on it. (*Id.*, p. 92). To reconcile the comparables with the subject property, Lareau placed a value on the foundation - $20,000. Under questioning, it is clear that Lareau ignored or failed to seek available information for this crucial value. He has no experience in valuing a foundation. (*Id.*, p. 96). He had no comparable foundations to use. (*Id.*, p. 92).

While Lareau has personal and professional experience with pouring concrete foundations, he ignored it. Lareau has a home construction business and recently did foundation work for a "much smaller" house at a cost of $30,000. (*Id.*, p. 93). He estimated that the cost to pour a new foundation comparable to the Paquettes' would be more than $35,000. (*Id.*, p. 98). Of course, the Paquettes' foundation was not new, but Lareau testified that foundations do not depreciate very much unless they have significant cracking or if the fire left a lingering smell. (*Id.*, p. 99). He conceded that a professional engineer inspected the Paquette foundation after the fire and found no significant cracks. (*Id.*, pp. 102 – 104). He also conceded that he had no knowledge of any lingering smell.

(*Id.*, p. 98).  Thus, he could have used the cost approach to value the foundation in this

case.  (*Id.*, pp. 99 – 100).  That approach involved looking up the cost in a Cost Manual to

ascertain what it would have cost to build the Paquette foundation, and deducting the

minimal depreciation.  (*Id.*, pp. 99 - 100).  He did not do this.

Lareau learned, but did not include in his report, that the taxing authority valued

the foundation at $23,000.  (*Id.*, p. 92).  He considered that valuation very conservative.

(*Id.*, p. 97).  Asked how he came up with his valuation of $20,000 for the foundation,

Lareau simply could not articulate a basis:

> Q.      And have you ever valued land that had a foundation on it before?
>
> A.      I do not believe so.
>
> Q.      Okay.  And so when you went to value this piece of property with a foundation, what, if anything, did you do to educate yourself as to how to assign a value to the foundation?
>
> A.      I did not.
>
> Q.      Can you give me any kind of formula or any kind of a calculation that you might have done to arrive at the $20,000 assigned value to the foundation in this property?
>
> A.      No, I can't.
>
> Q.      Okay.  Did you look up anything to get to the $20,000?
>
> A.      No, I didn't.
>
> Q.      So the $20,000 was just a product of your thought process?
>
> A.      Yes.
>
> Q.      And your thought process did not include any data?
>
> A.      No.
>
> Q.      Except for the fact that you knew that the town had assessed it for $23,000, right?

47

A.      Well, that, and like I said, I know that that number is conservative.

(*Id.*, p. 96 – 97).

The February 8 email only casts more doubt on the reliability of Lareau's

opinions.  Counsel wrote:

> Mr. Lareau looked at the cost approach for a new house and noted that the value of a new foundation was $34,810.  Mr. Lareau is of the opinion[17] that it is common for quotes for concrete to vary significantly between contractors (10% is not unusual).  Based on these variables and that the existing foundation at the Paquette property was not new, Mr. Lareau is not changing his opinion as to the value of the property with the existing foundation.

(Exh. "L").  It appears that despite his sworn testimony that concrete foundations would

not depreciate "very much", absent cracking or a lingering smell, he nonetheless

depreciated the foundation by $14,810, or 42%.

Lareau's failure to give any consideration to the cost of demolition and cartage,

evaluation and/or rehabilitation costs for the foundation and utility lines, landscaping

repairs, and his failure to use any discernible methodology to value the remaining

foundation render his "after" opinion speculative and unhelpful.  The diminution in value

approach depends on two reliable valuations, the "before" and the "after" values, and

neither of Lareau's valuations is reliable.

## 2.      Personal Property Appraiser Thomas Hirchak III

A+ disclosed an expert on personal property valuation, Thomas Hirchak III.  On

December 9, 2016, A+ filed a motion seeking an extension to give Hirchak until January

3, 2017 to complete his report.  The central basis for the motion was the "time consuming

nature of providing a value for 688 items of personal property."  (Document 23, ¶6).

---

[17]      As is stated in footnote 14, above, nothing in the Rules permits a party to introduce new opinions under the guise of supplementation.

This Court granted that motion.  (Document 29).  On January 3, A+ served plaintiff with Hirchak's one-page report.  (Hirchak Report, a copy of which is attached hereto as Exhibit "O").  Contrary to the linchpin promise in A+'s motion, Hirchak did not provide a value for a single item of personal property.  Instead he stated:  "The lack of detailed specifications, condition reports and/or a photographic record make it impossible to arrive at legitimate estimates of value."  (*Id.*)

In his deposition, Hirchak conceded that he could have valued the personal property if only he had been given the opportunity the visit the fire scene, take photographs, and submit deposition questions to A+'s counsel to gather additional information about the items, such as make, model, condition and usage.

Q.      Have you ever been contacted to put a value on personal property that has been through some type of a catastrophe, like a fire or a flood?

A.      Yes.

Q.      And what's the normal context in which you'd be approached to do that?

A.      I don't follow.

Q.      In what situations have you been asked to do that?

A.      Oh.  I don't recall the year, but it was -- it was a fire loss in, I want to say, Lyndonville.  The roofers went to lunch and they left a torch on the roof, right?

*          *          *          *

THE WITNESS:      And the thing, like, burned.  But in that case I went into the building before they gutted it and looked at all this stuff, and it was there, so, you know, we could reasonably come up with values for it.

BY MR. SMITH:

Q.      Okay.  So in that case you actually did come up with values for the lost personal property?

A.      Yes.

Q.      In this case had you been given the opportunity to go into the fire scene and do the same thing you did in that prior case, do you have any doubt that you could have come up with a fair market value for the property that was damaged in this fire?

A.      Depending upon the condition of the remnants, it's possible.

Q.      Okay.

A.      Yup.

Q.      And if you had also had the opportunity to get additional information about the specific items from the owners of those items, would that have assisted you and you could use that along with what you observed?

A.      If I had more detailed information, I could probably work on it and come up with something.

Q.      Okay.  So in this case you weren't given the depositions of the Paquettes, and that could supply additional information for you to work with; is that correct?

A.      I don't know if that's a statement or a question.  I suppose if there were additional meaningful information, there could be a way to ferret it out.

Q.      Okay.  Well, I mean, let's -- let's try to go in sequence here.  Would you agree that you would have liked to have been able to go to this fire scene and look at the items yourself, take photos of the items so that you could refer to them later?  Is that -- is that something you would have liked to have done here?

A.      *That would have enabled the process to occur, probably.*

Q.      Okay.  And you've done similar fire scene examinations, and based on those you've been able to value personal property?

A.      Yes.

Q.      And if you had questions after doing the fire scene exam and taking your photographs, you could have fed them to the lawyer in this case and asked him to ask the Paquettes those questions to get additional information, correct?

A.      I presume so, yes.

Q.      Okay.  So, for instance, if there was a power drill in the fire scene and you could tell there was a power drill but you didn't know how old it was, how much use it had gotten, or what its condition was, you could have said, Hey, Mr. Heath

50

or Ms. Lednicky, ask -- ask Joe Paquette about that power drill; I need to know X, Y, and Z.  Could you have done that?

A.     Yes.

Q.     Okay.  If there was something in the fire scene that was unrecognizable and you had a photograph of it, you could have asked the lawyer to show that photograph to one of the Paquettes and see if they could identify it through a photograph, right?

A.     Yes.

(Hirchak, pp. 16 – 19)(emphasis added)(pertinent portions of the Hirchak deposition are attached hereto as Exhibit "P").  The absence of that information prevented him from valuing any of the 688 items lost in the fire.

A+ had ample opportunity to acquire the very information Hirchak could have used to develop a personal property valuation.  The fire was on February 26, 2014.  After being placed on notice of this fire by overnight mail sent on March 3, 2014, a joint fire scene examination was scheduled for March 18, 2014.  A+ chose to send only a fire investigator, not Hirchak or any other personal property valuation expert, and thereby forewent the best opportunity to observe and photograph the personal property and assess its age, condition and value.

It is difficult to predict how A+ intends to use Hirchak at trial.  His statements offer no assistance to a jury.  To the extent his report implies that no one else can value the personal property – "Given the information provided, I do not believe that I or anyone else could determine a realistic value as of the time of the loss" - he clarified the statement in his deposition by testifying that valuation is indeed possible where someone has the pertinent information.  Thus, he should be barred from testifying that no one else could value the items.

## III.   ARGUMENT

"Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir.2000) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir.1994)).  The party offering the expert must prove each of these requirements by a preponderance of the evidence.  In re TMI Litig., 193 F.3d 613, 663 (3d Cir.1999).

### A.   Qualifications

A proffered expert's general knowledge in an area does not make up for a lack of specialized knowledge in the field at issue. Dorman Products, Inc. v. Paccar, Inc., 2016 WL 4440322 (E.D. Pa. 2016).  In Dorman, the court precluded the defendant's expert because, despite general knowledge in designing products, he lacked specialized knowledge in the design of vehicle headlights.  The Court reasoned:

> In support of these technical opinions, Mr. Woodring offers nothing more than his generalized experience as an industrial designer.  Mr. Woodring has admittedly never designed a vehicle headlight or a product comparable to a vehicle headlight.  Mr. Woodring's experience designing the packaging of batteries and shock absorbers, combined with his experience designing camera strobes, does not constitute "specialized knowledge" regarding the areas in which he is proposed to testify.

> PACCAR argues that the "pertinent art" in this case is "the ornamental design of vehicle headlights" and that Mr. Woodring is qualified because he is an expert in ornamental design.  However, the ordinary designer standard also requires consideration of "the problems of developing designs in a particular field."  Mr. Woodring's general design experience does not qualify him to testify about the problems of developing designs for headlights in the automotive field.  His opinions, particularly with regard to ornamentality, go far beyond appearance and relate to many of the functional elements of the headlights.  Moreover, he does not offer any support for his averred specialized knowledge regarding aerodynamics, thermal management, or compliance with federal highway safety regulations, and his generalized experience as an industrial designer does not provide such support.

> For these reasons, the Court grants Dorman's Motion to Exclude the expert
> opinions of Cooper Woodring.

Id. at *15 – 16 (citations omitted).  Moreover, experience in testifying cannot make up for

experience in the relevant field:  "[I]t would be absurd to conclude that one can become

an expert simply by accumulating experience in testifying."  Thomas J. Kline, Inc. v.

Lorillard, Inc., 878 F.2d 791, 800 (4th Cir. 1989), cert. denied, 493 U.S. 1073 (1990).

A+'s liability expert Morse suffers from the same lack of qualification that led the

Dorman court to bar Cooper Woodring.  Morse was tasked with distinguishing between a

fire that started inside vs. outside the metalbestos chimney in this case.  He could not

recall doing any prior investigations involving metalbestos chimneys, and admits that he

did not rely on any conversations with his colleagues or his review of Kirk's Fire

Investigation.  He falls back on his general engineering education, but repeatedly admits

he did not do the kinds of analyses his general education equipped him to do.  Even as a

testifying expert, he lacks experience, having only testified once before as a fire origin

and cause expert.

He is even less qualified to offer opinions on Ingalls' compliance with the

standard of care.  He has no background or experience as a chimney sweep.  He has no

experience in interpreting and applying Chapter 14 of NFPA 211.  He has never before

done an investigation involving Chapter 14 of the NFPA 211, which requires Level I

inspections along with routine chimney cleanings.  Morse lacks sufficient qualifications

to offer the opinions he has expressed in this case.

(Plaintiff does not challenge the qualifications of A+'s damage experts Lareau

and Hirchak.)

**B.      A+'s Expert Opinions Are Not Reliable.**

In Dalton v. McCourt Electric LLC, 112 F.Supp.3d 320 (E.D. Pa. 2015), the

Court summarized the reliability requirement to be met by the party proffering a

challenged expert:

> Under the second requirement, that of reliability, when the expert testifies to
> "scientific knowledge," the expert's opinions "must be based on the 'methods and
> procedures of science' rather than on 'subjective belief or unsupported
> speculation'; the expert must have 'good grounds' for his or her belief."  In
> considering whether there are "good grounds" for the expert's opinions, courts
> often look to a number of factors, such as:  (1) whether a method consists of a
> testable hypothesis; (2) whether the method has been subject to peer review; (3)
> the known or potential rate of error; (4) the existence and maintenance of
> standards controlling the technique's operation; (5) whether the method is
> generally accepted; (6) the relationship of the technique to methods which have
> been established to be reliable; (7) the qualifications of the expert witness
> testifying based on the methodology; and (8) the non-judicial uses to which the
> method has been put.  This list of factors "is non-exclusive," however, and "each
> factor need not be applied in every case."  As the Supreme Court in Kumho Tire
> noted, the district court "must have considerable leeway in deciding in a particular
> case how to go about determining whether particular expert testimony is reliable.
> That is to say, a trial court should consider the specific factors identified in
> Daubert where they are reasonable measures of the reliability of expert
> testimony."

Id., at 325.

These principles apply with equal force to expert opinions on causation.  Henry v.

St. Croix Alumina, LLC, 572 Fed.Appx. 114 (3d Cir. 2014)(Ct. upheld trial court's

preclusion *in toto*, due to lack of reliability, of plaintiffs' experts on the issue of what

material plaintiffs were exposed to, the amount, and the danger posed by that exposure);

In re Zoloft Product Liability Litigation, 26 F.Supp. 3d 449, 462 (E.D. Pa. 2014).  The

party proffering the expert must come forward with proof of a valid methodology based

on more than the *ipse dixit* of the expert.  Pappas v. Sony Elecs., Inc., 136 F.Supp.2d 413,

426 (W.D.Pa.2000).  "Expert testimony that offers only a bare conclusion is insufficient

to prove the expert's point." <u>SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.</u>, 188 F.3d 11, 25 (1ˢᵗ Cir. 1999).  "Haphazard, intuitive inquiries" and investigations that use "little, if any, methodology beyond [the expert's] own intuition" are unacceptable.  <u>Oddi v. Ford Motor Company</u>, 234 F.3d 156, 158 (3d Cir. 2000).  So are "subjective beliefs" and "unsupported speculation".  <u>Id.</u> at 158.  "*Ipse dixit* does not withstand <u>Daubert</u> scrutiny."  <u>Id.</u>  "An opinion based on subjective belief, rather than grounded in science, is not admissible."  <u>In re Zoloft</u>, at 462.  <u>See also</u> <u>DiPaolo v. Black and Decker (US) Inc.</u>, 2009 WL 5064548 *5 (E.D. Pa. 2009)(expert's opinions regarding the defective nature of a power saw rejected because he "used little, if any, methodology beyond his own intuition").

In <u>Furlan v. Schindler Elevator Corporation</u>, 861 F.Supp.2d 291, 298 (E.D. Pa. 2012), the plaintiff's proffered elevator expert was precluded from testifying in a case alleging improper maintenance of an elevator for lack of a reliable basis:

> Plaintiffs have not demonstrated by a preponderance of the evidence that Mr. Kennedy's opinion is reliable.  Like the engineer in <u>Oddi</u>, he "used little, if any, methodology beyond his own intuition." <u>Id. at 158.</u>  The only "standard" that guided Mr. Kennedy's analysis was his perception, based on an amateur photograph and the fact that an accident occurred, that the gap between the finger guard and the handrail was too large.  Mr. Kennedy "conducted no tests" to ascertain the adequacy of defendants' maintenance.  <u>Id.</u> He did not, for example, test whether the Boscov's finger guard was worn by comparing Mr. Furlan's photographs to a brand-new finger guard.  He did not test whether a smaller clearance was feasible; in fact, he asserted that he was "not qualified" to do so. (Kennedy Dep. 130–31.)  He admitted in his deposition that he has "no idea" by what mechanism Robert's fingers got caught in the escalator.  (Id. at 131–35.)  Other factors similarly show unreliability:  plaintiffs presented no evidence that Mr. Kennedy's technique is generally accepted, has been subject to peer review, is an outgrowth of a reliable methodology, or has been put to any nonjudicial use, and his method has no known or potential rate of error.

A Vermont Supreme Court decision upheld the exclusion, under the <u>Daubert</u> standard, of an expert who lacked specific information about the emission, collection and

ignition of volatile chemicals in a fire case.  In Lasek v. Vermont Vapor, Inc., 95 A.3d

447 (Vt. 2014)(Crawford, J.), a proffered expert could not support his theories as to how

vapors coming off a mixture of liquid nicotine and other chemicals could rise within a

room, collect in sufficient quantities and migrate to the proffered ignition source, the pilot

light of an overhead industrial space heater.  The Court reasoned:

> The trial court properly excluded the fire investigator's testimony because it was
> based on speculation.  Although the evidence showed that [defendant] VVI used
> nicotine and other chemicals in the course of its business, there was no evidence
> that these chemicals were present in the lab in a quantity sufficient to ignite
> a flame at a space heater above and outside of the room on the night of the fire.
> Furthermore, the fire investigator was unable to offer a reliable explanation of
> how any nicotine vapors that were present would be able to travel up to the space
> heater because, as he conceded, nicotine vapors are heavier than air and would
> therefore tend to sink rather than rise.  He opined that the combination of various
> chemicals might cause the vapors to rise, but admitted that he did not have a
> chemical engineering background and could not explain what mixture of
> chemicals might cause that to happen or whether it was likely to have occurred in
> this case.  We agree with the trial court that the fire investigator's opinion about
> causation was not "based upon sufficient facts or data," and was therefore
> unreliable.  V.R.E. 702.

> ¶ 13. Plaintiff argues that in his motion for a new trial he provided the court with
> data showing that the density of liquid nicotine equals that of air at sixty-eight
> degrees Fahrenheit, so it was not "junk science" to conclude that vapor from
> liquid nicotine could reach the space heater.  The fact remains, however, that
> plaintiff's fire investigator was unqualified to explain this information to the jury.
> He was also unable to say what amount of liquid nicotine had to be present in the
> open in order for the vapors to escape the lab in a sufficient concentration to
> ignite, or whether that concentration of vapors was present on the night of the fire.
> The trial court therefore did not abuse its discretion in excluding his testimony.

Id., at 250 – 251.

Courts have also found that the weakness of an expert's qualifications can

undermine the reliability of his opinions.  In Furlan, the expert's lack of specific

experience reflected poorly on his overall reliability:

> Finally, Mr. Kennedy's qualifications provide no reassurance that his opinion is
> reliable.  "[A]n expert's 'level of expertise may affect the reliability of the

expert's opinion.' "  Mr. Kennedy has not performed maintenance work on an escalator since the 1980s.  He has no formal education relating to escalators, engineering, or any relevant field.  At his deposition, he could not identify an instance in which he had maintained or repaired an HC–48 escalator, and he has never seen the finger guard of an HC–48 escalator in new condition.

For these reasons, Mr. Kennedy's opinion does not satisfy <u>Daubert's</u> reliability requirement, and the Court grants defendant's motion to preclude his testimony.

<u>Id.</u>, at 298 – 299 (citations omitted).

Furthermore, experts who rely on second-hand information must have a reliable basis for it.  <u>Gold v. State Farm Fire and Casualty Company</u>, 880 F.Supp.2d 587, 596 (E.D. Pa. 2012).  The <u>Gold</u> court reasoned:

On the record before the Court, the foundation for Schechterly's opinion [on causation] is a suggestion he received from Mrs. Gold on the basis of a conversation she had with her pharmacist.  The plaintiffs do not argue, or present any evidence, that Schechterly returned to the property to make this conclusion, that he inspected the plumbing at the house during his initial visit, or that he consulted any additional materials in reaching his later conclusion that broken utility pipes "possibl[y]" caused the damage to the property.

A+'s experts fail the reliability tests set forth above.

### 1.    **Morse's Unreliability**

Morse's hypothesis that the fire started inside the chimney is not reliable.  He is unaware of certain hallmarks of chimney fires, such as a glowing stovepipe or a loud noise, and therefore his theory does not explain their absence.  Each crucial step in his analysis is speculative and unsupported.  His opinion that the cleanout cap was firmly in place at the time the fire started is specious.  The last time it was said to be in place was at the last cleaning, approximately three or four months before the fire.  He admits to having no knowledge as to how the subject cleanout cap was held in place.  Instead, Morse relies on a brand new Tee cap he cannot prove to be a reliable exemplar of the one at the Paquettes.

His ignition scenario is equally unsubstantiated.  He posits a spark or ember drawn up the chimney that, instead of exiting the top, alights on caked-on creosote, remains hot despite the upward air currents, and causes ignition.  But Morse cannot establish where the creosote buildup was, and he cannot explain what was different about this occasion to explain why prior creosote build-ups were not ignited by embers.

Finally, his spread scenario strains credulity.  For a fire inside the chimney to start a second fire outside the chimney, sufficient heat must penetrate the inner stainless steel tube, the insulation layer, the outer stainless steel tube and a minimum 2" air gap and still have enough heat to ignite something.  Morse cannot offer any specifics for any of these heat exchanges.  He gives a 1,000-degree range for the hypothesized creosote fire in the chimney and larger range for the temperature on the outside surface.  He has no knowledge of the design of the chimney and, specifically, if and to what extent it was designed to contain the heat of a foreseeable chimney fire.  He cannot say how much of the original heat inside the chimney was lost in the transfers to the outside.  And he cannot identify the outside combustible or its ignition temperature.

It is clear that Morse offers nothing more than his intuitive conclusions, subjective beliefs and *ipse dixit*.  He posits a chimney fire and bootstraps an endless string of speculative facts and opinions to support his theory.  This analysis does not pass muster under Daubert.

His standard of care opinions are even less reliable.  He draws a self-serving interpretation of NFPA 211, without any authority or experience, that a removable cleanout cap need not be removed for cleaning.  He makes contradictory statements about Ingalls' duty to ascertain whether the cleanout cap was "readily accessible" - the

acknowledged trigger for a Level I inspection - before ultimately admitting that Ingalls

should have either looked on the other side of the living room wall or asked the

Paquettes.

### 2.       Lareau's Unreliability

To analyze Lareau's reliability, it is important to see how his proffered opinions

are intended to fit into Vermont law.  Vermont establishes the measure of damages for

each category of the claim.  For the building damages, the Supreme Court of Vermont

articulated the measure of damages as follows:

> If the injury is temporary in the sense that restoration can cure the harm, the
> reasonable cost of repair may serve the need and provide adequate and fair
> compensation.  If the damage is permanent and beyond full repair, the variance in
> value of the property before and after the injury often affords the better guide to a
> just award.

Bean v. Sears, Roebuck & Company, 129 Vt. 278, 282,276 A.2d 613, 616 (1971).  In this

case, restoration could cure the harm, so the reasonable cost of repair would provide

adequate and fair compensation.  Nationwide paid $273,946.00 for the damages to the

building.

A+ appears to be using Lareau as if the "damage [had been] permanent and

beyond full repair" and accordingly, proffers his opinions to establish "the value of the

property before and after the injury."  The Bean formulation of recoverable damages was

re-examined by the Supreme Court of Vermont in Langlois v. Town of Proctor,  198 Vt.

137, 113 A.3d 44 (2014).  There, the Town did not promptly turn off water to a structure

causing the pipes to freeze and rupture.  Langlois proved the damages using the repair

cost measure.  The Town argued that the plaintiff should also bear the burden to prove

that the repair cost was not disproportionate to the diminution in value, and the jury

should have been instructed as to both measures of damages.  The Court disagreed with the Town.

The central holding was that the plaintiff did not have the burden to prove that the repair cost was not disproportionate to the diminution in value, and since the Town offered no evidence of disproportionality, the trial court was not required to instruct on proportionality.  However, in *dicta*, the Court took the opportunity to clarify the measure of damages enunciated in <u>Bean</u>.

> We now clarify that the proportionality of cost-of-repair damages relative to the value of the property prior to a tort injury to property is part of the general inquiry on the reasonableness of damages.
>
> \*              \*              \*              \*
>
> The Town urges us to require this disproportionality inquiry as part of plaintiff's prima facie case, citing our case law requiring sufficient proof of damages generally, such that the jury may determine damages "with reasonable certainty." We hold instead that the burden of introducing additional evidence with respect to the proportionality of cost-of-repair evidence more appropriately falls on the party who wishes to challenge the cost-of-repair evidence, in this case the Town.
>
> \*              \*              \*              \*
>
> ¶ 45. Our standard rule for tort damages is that "plaintiffs must prove, by a preponderance of the evidence, the extent and nature of their damages.  Plaintiffs must further show that such damages are the direct, necessary, and probable result of defendant's negligent act."  We see no reason to alter this rule for plaintiff's prima facie case.
>
> \*              \*              \*              \*
>
> Although plaintiffs always bear the burden of proof as to the reasonableness of damages, once plaintiff made a *prima facie* case, the burden of production was then on the Town to present evidence that cost-of-repair damages in this case were unreasonable, for instance in comparison with the value of the building in

2008, or in comparison with the diminution in value of the building before and after the damage occurred.

*Id.*, 198 Vt. at 158 (citations omitted).  Thus, A+ attempts to do what the Town of Proctor failed to do in Langlois, *i.e.*, prove the diminution in value of the building caused by the fire.

Against this backdrop, Lareau's opinions must be scrutinized under Daubert. Lareau's opinions are useful only if both his "before" and "after" values are admissible. No valid diminution in value can be calculated unless both the subtrahend and the minuend in the subtraction formula are admissible.  If only the "before" value is known and the "after" value is too speculative, there can be no valid diminution calculation. Likewise, if the "before" value is unreliable, the "after" value is useless.

In this case, both components are unreliable and therefore inadmissible.  As to the "before" value, Lareau assigned zero value to the most important selling features of the Paquette property – its cathedral ceilings, its two-story wall of windows looking out on a stand of trees, and its generous setback from the road.  He offers no reasonable basis for completely discounting these features.  If he had included another property with one or more of these features, his appraisal might be more reliable; instead, he only compares this property to others lacking these features and makes no attempt to adjust those other properties accordingly.  This omission dooms all of his so-called comparable sales.

Lareau's "before" valuation is unreliable also because of comparable sale #2.  In his original report and his testimony, he failed to supply any consideration of the 9-day sale period, and nothing in his belated supplemental disclosure corrects the omission.  To

the contrary, the property sold in 9 days for less than the listing price,[18] raising the question – unanswered by Lareau – as to what led to the below-list price quick sale. Defense counsel's statement in the improper supplemental disclosure that it sold in an arm's-length transaction is *ipse dixit* or an opinion by another appraiser (Bill Young) who A+ did not disclose as a testifying expert.

Lareau's "after" value is likewise unreliable. It omits crucial costs and relies on a value for the concrete foundation that is divorced from Lareau's own principles. Lareau admittedly failed to do an apples-to-apples comparison. For the Paquette property to compare to the unimproved parcels Lareau used as comparable sales, various considerations had to be factored into the analysis. Lareau admittedly gave no consideration to the costs to remove the fire debris or to repair the landscape damages that would foreseeably result. Once removed, the foundation and utility connections would need to be evaluated and any necessary repairs made; Lareau omitted any such analysis.

Finally, Lareau offers no reliable basis for his valuation of the foundation. His comparable properties had no foundation, so they offer no guidance. His appraisal experience is of no assistance since he admitted he had never valued a foundation before. He learned that the town had valued the foundation for tax purposes at $23,000, but acknowledged that this valuation was "very conservative".

The only background he brings to the foundation value is not tied to his disclosure by A+ as a real estate appraiser. He has a side business building houses, and his

---

[18]     The original listing price was $199,900.  The sale price was $192,000.
Because the MLS listing was not produced until after the deposition, plaintiff did not
have the opportunity to ask Lareau about the lowering of the price in the 9-day
marketing period and its effect on the reliability of Comparable Sale #2 as an
indicator of the "before" value of the Paquettes' property.

experience in that business told him the foundation was much more valuable than $20,000.  He estimated in his deposition that to pour a new foundation of comparable size was approximately $35,000.  In his belated supplemental disclosure, he amended that number to $34,810, but refused to change his "after" opinion.  Thus, despite testifying that foundations do not depreciate very much, absent cracking and lingering odors not present here, he depreciated the foundation from $34,810 to $20,000, or 42%, without any explanation.  Lareau's "after" value is unreliable and inadmissible.  This Court should not accept Lareau's *ipse dixit*.

### 3.        Hirchak's Unreliability

The measure of damages for destruction of personal property is flexible.  The general rule is:  "It is undisputed that the measure of damages to a motor vehicle is fair market value before the injury less fair market value after the injury."  Wells v. Village of Orleans, Inc., 132 Vt. 216, 223, 315 A.2d 463, 468 (1974).  However, there is precedent for measuring the damage of personal property items by the cost to replace them with comparable new items.  In Viskup v. Hegle, 2013 WL 2923501 (Vt. 2013), an unpublished opinion, the Supreme Court allowed personal property to be valued at replacement cost in the context of a divorce in which the husband sold a dwelling with the wife's personal property still in it.  The wife presented evidence of the cost to replace the lost items and the Court upheld the trial court's valuation based on the replacement cost.

Similarly, in State v. Tetrault, 192 Vt. 616, 54 A.3d 146 (2012), the Court ordered restitution for damaged personal property valued at the cost to replace, on the following reasoning:

Finally, defendant argues that even if the court was correct in awarding restitution, the proper measure of damages should have been the actual value of the items at the time of the trespass, not their replacement cost. He cites State v. Ellis for the proposition that "[t]he purpose of restitution is to make the victim whole, not to punish. Nor is the purpose to give the victim a windfall." 172 Ariz. 549, 838 P.2d 1310, 1311 (Ct.App.1992) (citation omitted). He also cites to our decision in State v. Curtis, in which we held that an automobile damaged through a criminal act should be valued at its so-called "blue book" fair market value for the purpose of restitution. 140 Vt. 621, 622, 443 A.2d 454, 455 (1982).

¶ 13. *While the value of a used microwave or toaster would be lower than the value of the identical appliances in new condition, defendant's suggestion that the replacement cost can be estimated by what the items might fetch at a yard sale is pettifoggery.* While defendant is correct that fair market value is the proper measure of damages for items with a readily ascertainable value, there is no "blue book" for used toasters or microwaves. A victim of a home invasion should not have to visit local thrift stores or pore through the classifieds to determine the value of a used blender. It was hardly a windfall for camp owner to replace items ruined by defendant and his friends' criminal acts. The court was well within its discretion in awarding camp owner restitution in the amount sought.

*Id.*, 192 Vt. at 619 (emphasis added).

Against this backdrop, it is clear that Hirchak adds nothing of value to the assessment of the Paquettes' personal property losses. He has the capability to value damaged personal property when provided with a sufficient factual basis of visual observations, photographs and information about the item's age, usage and condition, but since he was not provided with that information, he concedes that he was unable to reach any valuation of any of the lost personal property in this case.

**C.    Fit**

To be relevant and likely to "assist the trier of fact to understand the evidence or to determine a fact in issue," (F.R.E. 702), an expert's opinions "must have a valid connection to the pertinent inquiry." Cipollone v. Yale Industrial Products, Inc., 202 F.3d 376, 380 (1st Cir. 2000). Such a connection was found to be missing in Cipollone, where the proffered expert described an alleged hazard that would exist if someone was

using the subject product (a customized loading dock) was "holding something 2.10 inches in diameter." As the First Circuit observed in affirming the District Court's to exclude the expert's testimony, the plaintiff "never contended he was holding anything during the accident; indeed, he testified he was holding nothing when the accident occurred." *Id.* Because the expert "described a ... hazard that did not cause [plaintiff's] injury, and [plaintiff] described an injury that did not result from the shearing hazard [the expert] described, the expert's testimony was properly regarded as irrelevant and inadmissible under *Daubert*. *Id.*; *see also Bogosian v. Mercedes-Benz of North America, Inc.*, 104 F.3d 472, 479 (1st Cir. 1992)(exclusion upheld where expert's opinion rested on assumptions about accident inconsistent with plaintiff's testimony).

A+'s experts express opinions that do not fit the circumstances of the case. Morse's opinions do not have a valid connection to the inquiry over whether the fire started inside or outside the metalbestos chimney because he lacks the facts to make the connection. He needs the cleanout cap to have been in place at the start of the fire while the physical evidence is inconsistent with such a position. He needs the spark or ember to be drawn only partway up the chimney. He needs creosote to be where the ember or spark stops. He needs ignition to occur. He needs sufficient heat on the inside of the chimney to produce sufficient heat on the outside to ignite a combustible material.

Morse has none of these facts. He, like the experts precluded in Cipollone and Bogosian, ignores established facts, such as the fact that no smoke was seen coming out of the woodstove itself, and Britain Paquette's observation of fire burning through the ceiling just below the Tee. He ignores the evidence of fire attack on the mating surfaces of both the Tee and the cleanout cap.

Similarly, Lareau's opinions lack fit.  The Paquette property before the fire had dramatic cathedral ceilings, a two-story wall of windows overlooking the yard and a stand of trees, and a generous setback.  Lareau did not use any truly comparable properties, and made no adjustments to the chosen comparables to reflect these differences.  The property after the fire had a burned hulk on a foundation that needed to be evaluated before being reused, and Lareau compared it to vacant land.  He pulled a value for the foundation out of thin air, contradicted by his personal experience with foundations and his cost approach valuation as an appraiser.

Hirchak offers no opinion because he was called in too late to do his job as he otherwise could.

## IV.   CONCLUSION

Based on the foregoing facts, authorities and arguments, plaintiff respectfully requests this Court to preclude A+'s experts from testifying at trial.  Though complete preclusion is a drastic remedy, it is warranted in this case based on the record establishing their lack of qualifications, reliability and fit.

Respectfully submitted,

LAW OFFICES OF STEVEN L. SMITH, P.C.

BY:   _____

Steven L. Smith, Esquire
Attorney for Plaintiff
404 Harvard Avenue
Swarthmore, PA  19081
(610) 543-2700
ssmith@subrosmith.com

Date: March 13, 2017

66