U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2017 MAY -8 AM 10: 56

BY _____
DEPUTY CLERK

NATIONWIDE PROPERTY & )
CASUALTY INSURANCE CO., as )
subrogee of Joseph and Britain Paquette, )
  )
  Plaintiff, )
  )
v. ) Case No. 5:16-cv-69
  )
A+ CHIMNEY SERVICE, LLC, )
  )
  Defendant. )

**ORDER ON MOTIONS IN LIMINE, MOTION TO PRECLUDE, AND MOTION TO STRIKE**
**(Docs. 33, 34, 35, 36)**

Following a catastrophic house fire, the homeowner's insurer Nationwide Property & Casualty Insurance Co. ("Nationwide") brings this subrogation action against a chimney cleaning company which had swept the chimney a few months before the fire. Both sides have filed challenges under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to the experts identified by the other side, both on issues of liability and damages. (Docs. 33, 34, 35.) The court heard argument on the motions on April 17, 2017.

**Facts**

The basic facts are not in dispute. Nationwide's insureds, Joseph Paquette and Britain Lenicki (formerly Paquette), purchased a single family home in Bakersfield, Vermont in 2007. The home came equipped with a Jotul woodstove on the ground floor. The woodstove was attached to an insulated "metalbestos" chimney which rose through the interior of the house. Except for some sections of stove pipe connecting the stove to the chimney, the chimney ran vertically to the roof. The lowest section of chimney pipe was connected to a "tee fitting" which connected the stove pipe to the chimney. The stove pipe entered the chimney at a right angle.

The "tee fitting" featured a removeable sheet metal plug for clean-out and inspection at the bottom of the tee. The plug consists of a flat cover and a circular sleeve, sized to fit into a standard six-inch chimney pipe. The plug was designed to be pushed into the bottom of the chimney and held in place by friction. It was not secured by screws or other hardware.

The plug involved in this case was effectively useless for inspection or clean-out because the entire chimney was encased within the interior walls of the house. It was largely inaccessible to the homeowners or to a person maintaining the chimney. There was limited access to the plug through the chimney itself by removing the stove pipe connection and reaching in. But the plug did not function as intended as a clean-out and inspection point. A schematic drawing, not to scale, is attached to this decision.

The fire occurred on February 26, 2014. Ms. Paquette saw fire and smoke coming from the ceiling of a home office adjacent to the chimney. She and her family escaped unharmed but the structure and the contents were a total loss. Nationwide paid the loss and investigated the cause and origin of the fire. Its suspicions fell on Alton Ingalls, owner of A+ Chimney Service, LLC ("A+ Chimney").

At his deposition, Mr. Ingalls reported that he had performed an annual cleaning for the Paquettes for multiple years. He was familiar with the design of the chimney. He would start his cleaning by removing the chimney cap and inserting a brush downwards from the roof. The brush with extension handles reached the entire length of the chimney. Mr. Ingalls knew that there was an inspection cap at the bottom of the chimney and that it was secured by friction. He would tap a few times on the cap to make certain that he had reached the bottom of the chimney with his brush.

After brushing the length of the vertical flue, he would enter the house and remove the thimble which secured the stove pipe to the interior wall and the chimney. He would remove the accumulated debris and soot from the base of the flue with his hand first and then with a vacuum. He could feel the presence of the cap at the base of the chimney but could not tell how secure or tight it was. (Doc. 41-1, Ingalls Dep. 93.)

I.      **Motions Related to Liability Experts (Docs. 33, 35)**

    A.      **Competing Theories of Cause and Origin**

The parties agree that the fire originated in or around the chimney as a result of the operation of the Jotul stove. The principal factual dispute is whether there is any evidence to support Plaintiff's claim that Mr. Ingalls dislodged the base cap.

The parties agree that the design of the house and chimney were not ideal. The purpose of the cap is that it can be removed to clear out stove ash or a dead bird as well as to provide an inspection point. Because the chimney is entirely enclosed by interior walls without any access, the cap could not be removed and replaced by a chimney sweep and was largely hidden from view.

Plaintiff's theory of the case is that in the course of cleaning the chimney over several seasons, Mr. Ingalls disturbed or dislodged the clean-out plug at the base of the chimney in the course of brushing out the chimney. With the chimney open at the bottom, the chimney did not function correctly, which explains the homeowners' complaints of smoky, balky operation. More seriously, the open bottom of the chimney allowed fly ash and other flammable debris to drop out of the chimney and into the house itself where they set fire to the building.

The primary evidence in support of this theory is the plug itself which was found on top of a pile of debris after the fire was extinguished. According to Plaintiff's expert Paul Moody,

neither the chimney nor the cap showed a demarcation line or other evidence that they were fitted together when the fire occurred. If the cap had been inserted into the chimney at the time of the fire, the outer surface of the sleeve of the cap which was in close contact with the interior surface of the chimney should have been protected from the effects of the fire. Instead, the entire base cap, including the sleeve, showed rust and other damage which indicated that it had been dislodged by the chimney sweep and was not shielded in any way from the fire.

The defense theory is that a chimney fire started inside the chimney and heated the chimney beyond its capacity to prevent ignition of the surrounding structure. The defense expert, Dr. Timothy Morse, states that the wreckage of the house and in particular the complete destruction of the chimney into a pile of separate parts makes it impossible to draw any conclusions about whether the cap was in place when the fire started. The most that can be said from his perspective is that by the end of the fire, the cap had come loose from the base section of the chimney and that other sections of the chimney were separated as well.

B.   **Opinion of Paul Moody**

Mr. Moody has spent more than 40 years as a plumber with particular expertise in heating systems. He operated his own plumbing and heating company from 1983–1990. More recently, he has worked for the State of Maine as an inspector and an instructor concerning National Fire Protection Association ("NFPA") standards relevant to home heating and fuels. His particular expertise is the operation of heating equipment, including chimneys.

Mr. Moody inspected the scene of the fire on March 18, 2014 in company with multiple fire investigators, including a team representing the defendant. In the course of the fire, the chimney sections had collapsed. He examined them and found no evidence of "warping or internal failure due to a chimney fire situation." (Doc. 41-8 at 3.) He examined the base cap or

"cleanout plug." It had not been secured to the lowest chimney section with sheet metal screws. It was found separate from the chimney section. His examination showed no signs of "demarcation marks consistent with the plug being in place." (*Id.* at 4.) The corrosion and heat damage he observed led him to believe that the plug was not in place at the time of the fire. In Mr. Moody's reconstruction of the likely course of events, Mr. Ingalls knocked the cap out of place in the course of cleaning the chimney and did not realize what he had done. (*Id.* at 7.)

Mr. Moody found fault with Mr. Ingalls and A+ Chimney for failing to conduct a complete inspection of the base of the chimney to determine that the cap was in place and for failing to advise the homeowners of the risk created by the unsecured cap. He identifies these shortcomings as violations of specific NFPA standards applicable to chimney cleaning in Vermont.

### C.     Opinion of William Minogue

Mr. Minogue is a fire inspector. He worked for 30 years as a firefighter, ultimately attaining the position of chief. He served from 2004–2014 as fire investigator for the County of Essex, New York. He is currently a private investigator and conducts fire inspections for insurance companies.

He was retained by Nationwide the day after the fire. In the course of his investigation, he reached the same conclusion as Mr. Moody. He believes that the chimney cap was not in place at the time of the fire because of the absence of demarcation lines and because the entire cap appeared to have suffered from the effects of the fire.

### D.     Defendant's Motion to Exclude Plaintiff's Liability Experts (Doc. 33)

Defendant moves to exclude Mr. Moody and Mr. Minogue on the ground that neither has sufficient expertise to testify about the cause of the fire. Defendant notes that Mr. Moody is not

5

a metallurgist and has no training or expertise concerning the effect of fire on the surface of metal. In Defendant's view, Mr. Minogue fares no better. Neither expert, it argues, knows enough about how the exposed surface of a metal cap reacts to fire to form an opinion about whether the corrosion and other damage they observed provide reliable information about whether the cap was in place at the time of the fire or had already been dislodged.

Mr. Moody and Mr. Minogue are experts whose first-hand observations and practical experience form a basis for their opinions. They differ from scientists whose research is published and tested by peer review. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court recognized that *Daubert* principles of reliability apply to such experts and that the trial court exercises discretion in considering whether the testimony has a reliable basis.

Mr. Moody's analysis rests upon several observations which require particular experience in the field of fire safety. First, in his view, the condition of the metalbestos chimney sections rules out a chimney fire as a cause of the fire. Second, the NFPA code as well as the chimney manufacturer's instructions require that the chimney cap be secured in place with screws or some other method of positive attachment other than friction. The defense does not take issue with these aspects of his report for purposes of *Daubert*. Third, if the cap had been in place when the fire broke out, there would be marks on the chimney and the cap showing that some of the sheet metal sleeve and chimney were protected from the effects of the fire. The absence of such marks and the uniform appearance of the cap indicates that no portion of it was shielded from the fire.

The court concludes that Mr. Moody's testimony falls within the experience of someone who is familiar with the effects of fire on heating equipment. Since the liability case largely turns on whether Mr. Ingalls had dislodged the cap prior to the fire, testimony that evidence of the effects of fire over the entire surface of the cap is relevant. The opinion that the surface of

the sleeve would appear different if it had been protected from direct contact with the flames and smoke is the type of experience-based observation that specialized investigators develop skill in conducting. The court makes no judgment about whether the opinion is correct, and there may be other explanations for the observations of Mr. Moody which will be offered by the defense. But Mr. Moody's observation that the cap looked as if it had been entirely exposed to the effects of the house fire is sufficiently reliable to be presented to the jury.

Mr. Minogue serves only to confirm the observations of the cap and the chimney made by Mr. Moody. For *Daubert* purposes, his observations are admissible for the same reasons as Mr. Moody's.

### E.     Plaintiff's Motion to Exclude Opinion of Dr. Timothy Morse (Doc. 35)

Dr. Morse is a mechanical engineer who specializes in the analysis and testing of "thermal and flow processes and equipment." (Doc. 43-3 at 28.) He has worked with a wide variety of equipment and installations in multiple applications, including the heating and fuel industries. He holds a doctorate in mechanical engineering from Cornell University.

In Dr. Morse's opinion, the fire started as a result of a chimney fire within the metalbestos chimney. The strongest evidence for this theory is that the damage from burning was concentrated in the area of the ceiling and upper portions of the house. In his view, the surrounding materials were ignited when the chimney fire caused excessive heat within the chimney. He also relies upon the homeowners' account of a smoky, poorly functioning woodstove which he believes was obstructed by the build-up of creosote and soot inside the chimney flue. (*Id.* at 21.)

Dr. Morse provides a response to Mr. Moody's opinions. In contrast to Mr. Moody, he credits Mr. Ingalls with making certain that the plug was in place in the course of the cleaning

7

process. If—as Dr. Morse believes—the plug was in place at the last cleaning in November 2013, then there was no mechanism to cause it to fall out before the fire in February 2014. He agrees with Mr. Moody that there were no demarcation lines in the chimney tee fitting or on the plug, but his deduction is that this demonstrates that the plug fell out at some point during the course of the fire. He also takes issue with Mr. Moody's analysis of the scope of inspection and warning required by the NFPA.

None of this is high science. Despite the size of the fire scene and the multiple inspections, the actual data points are few in number. These are:

- The history of chimney cleaning by the defendant;
- The account of poor functioning of the Jotul stove in the weeks before the fire;
- The discovery of smoke and fire at the level of the office ceiling adjacent to the chimney;
- The concentration of fire damage near the chimney, especially higher in the building;
- The separation of the plug from the tee section at some point in time;
- The lack of demarcation lines on the plug or the lowest chimney section;
- The appearance of corrosion and other effects of fire uniformly across the surface of the plug.

Both Mr. Moody and Dr. Morse develop their competing reconstruction of cause and origin by emphasizing different facts and drawing different conclusions from the evidence. Neither provides a comprehensive narrative, but each expert is practicing within the scope of what experts whose work is based on learned experience and personal observation typically provide.

The court concludes that all three liability experts comply with the requirements of Fed. R. Evid. 702 that experts possess specialized knowledge that will assist the jury in understanding

the evidence that their testimony is factually based; and that they have applied reliable principles and methods. The defendant's motion to exclude Mr. Moody and Mr. Minogue is DENIED. Similarly, the plaintiff's motion to exclude Dr. Morse is DENIED.

II.     **Motions Related to Damage Experts (Docs. 34, 35)**

    A.     **Defendant's Motion to Exclude Testimony of Robert Gomez**

Mr. Gomez is a licensed insurance adjuster employed by Nationwide. Before becoming an adjuster, he had experience as a carpenter and an estimator. Plaintiff has disclosed him as an expert on the value of the personal and real property lost or damaged in the fire.

Mr. Gomez calculated the loss of personal property based on its replacement cost. He calculated the damage to the structure based on the cost of materials and labor costs required to rebuild the structure. In this case, he used a software package known as Xactimate which is used by insurers and contractors. Mr. Gomez estimated the repair costs at $301,917.91. The homeowners received only $273,946, which was the policy limit for structural damage in their policy.

Mr. Gomez calculated the value of the personal property in a similar fashion. Using the Xactimate program, he ascertained the replacement cost for 688 items which the homeowners stated they had lost in the fire. The program calculates both the replacement cost for each item and the value of each item taking into account its age, usage and condition, or its "actual cash value." (*See* Doc. 38-1 at 38, Gomez Dep. 77.) Mr. Gomez described most personal property as lightly used which reduced the amount of depreciation subtracted from the replacement cost.

Mr. Gomez and the homeowners disagree on one step in the personal property valuation. Both homeowners recall that they were asked to write down the original purchase price of each object. (Doc. 34-2 at 3–5, Britain Lenicki (formerly Paquette) Dep. 85–87; Doc. 38-2 at 4,

9

Joseph Paquette Dep. 68.) Mr. Gomez testified that the Xactimate program automatically inserts current retail values for each item. (*See* Doc. 38-1 at 43, Gomez Dep. 101.) Both parties agree that Nationwide then applied a deduction for depreciation. The total paid for loss of personal property was $120,976.12. (*Id.*)

The defendant objects to the calculation of real property loss because Mr. Gomez did not subtract the value of the two acre lot and the foundation. (The house was a total loss and was not rebuilt.) It objects to the calculation of personal property loss because it was not based on the fair market value of each article at the time of the fire. The common thread is that Nationwide used a valuation method based on replacement cost. The defendant seeks to bar the testimony on the ground that Mr. Gomez failed to base his estimate on the fair market value of the personal property and the structure at the time of the loss. Defendant also objects that Mr. Gomez lacks sufficient training to provide expert testimony on valuation and that he employs improper methods.

**B.     Measure of Damages for Tortious Damage to a Structure**

The calculation of property loss is complicated by two competing principles. Damages in tort are intended to restore the plaintiff to the position he or she enjoyed immediately before the loss. But it would be wasteful to spend more than the value of a structure in an effort to repair or restore it. In *Bean v. Sears, Roebuck & Co.*, 129 Vt. 278, 282, 276 A.2d 613, 616 (1971), the Vermont Supreme Court explained that "the reasonable cost of repair may serve the need and provide adequate and fair compensation" if restoration is possible. If the damage cannot be repaired, "the variance in value of the property before and after the injury often affords the better guide to a just award." *Id.* The *Bean* decision sought to draw a distinction between temporary injury which could be fixed and permanent injury which may cost too much to repair. The Court

concluded its analysis with the observation that "[i]t all depends upon the character of the property and the nature and extent of the injury." *Id.*

The Court returned to the measure of damages to real property in *Langlois v. Town of Proctor*, 2014 VT 130, 198 Vt. 137, 113 A.3d 44. Noting the need for reasonableness in computing damages, the Court held that "the proportionality of cost-of-repair damages relative to the value of the property prior to a tort injury to property is part of the general inquiry on the reasonableness of damages." *Id.* ¶ 43. The Court clarified the burden of proof. If plaintiff seeks to recover the costs of repair, he or she bears the burden of proving those costs. If the defendant believes that the figure is unreasonable because it exceeds the fair market value of the property prior to loss, then he or she has the burden of production "to present evidence that cost-of-repair damages in this case were unreasonable." *Id.* ¶ 47.

The *Langlois* case permits the plaintiff in this case to introduce evidence of the cost of repairing or replacing the damaged structure. If this figure is unreasonable because it would exceed the value of the house prior to the loss, the defendant may introduce such evidence. As the standard bearer for the cost of repair, Mr. Gomez is entitled to testify concerning his calculation of the cost of rebuilding the house. It falls to the defendant to persuade the jury that this cost is unreasonable. Elements of that proof could include the fair market value of the home prior to the loss and the value of the lot and foundation afterwards. Because these are part of the defendant's case—not the plaintiff's—the plaintiff's expert is under no obligation to conform his testimony to defendant's theory of what constitutes a reasonable damage award.

The motion to exclude the testimony of Mr. Gomez on the cost of repairing the structure is DENIED.

### C. Measure of Damages for Personal Property Loss

The same principles govern damage awards for loss of property. Any award must be reasonable. Reasonableness is frequently measured by comparing the cost of repair with the cost of replacement. Because personal property depreciates quickly in many cases, reasonableness must also reflect the diminution in value between the time of original purchase and the time of loss. Both formulas are intuitively familiar to anyone who has experienced damage to their automobile.

In *Concord General Mutual Insurance Co. v. Gritman*, 2016 VT 45, 146 A.3d 882, the Vermont Supreme Court reviewed a damage award for loss of personal property. The contents of a home were destroyed in a fire. The adjuster for the homeowners computed the loss by calculating the post-fire replacement cost of each item "relying in part on estimates and supporting documentation provided by the [homeowners], and in part on insurance adjusting software." *Id.* ¶ 23. He reduced each amount "by applying a depreciation factor to each item to account for the age of each lost item relative to its expected life." *Id.* The Court noted that "the loss in value of a property as compared to its pre-injury value is the measure of damages in a negligence case." *Id.* ¶ 26. It held that the trial court acted within its discretion "in allowing the insurance adjuster to testify to the value of the items lost in the fire with reference to their replacement cost less depreciation." *Id.* ¶ 28. "Evidence of replacement cost less depreciation may have been the most probative evidence available as to market value." *Id.* The Court closed by noting that the defendant was "free to present to the jury countervailing evidence or argument that replacement-cost-less depreciation value was excessive relative to the loss in market value of the items in question." *Id.*

As in the case of damage to real property, the touchstone remains reasonableness. Plaintiffs are not tied to a single theory of damages, especially since, as the Vermont Supreme Court recognized in *State v. Tetrault*, 2012 VT 51, ¶ 13, 192 Vt. 616, 54 A.3d 146 (mem.), "there is no 'blue book' for used toasters or microwaves." The remedy for Defendant's concerns that the property damage estimate is inflated is to bring evidence or argument of its own, not to seek to exclude the property adjuster from testifying.

The motion to exclude Mr. Gomez from testifying as to personal property loss is DENIED.

The court also concludes that Mr. Gomez's extensive experience as an insurance adjuster qualifies him to make valuation assessments of personal and real property. His method of determining actual cash value of personal property by determining replacement cost and adjusting for use is one of two methods recognized as appropriate by Vermont case law. Similarly, the use of a replacement model of valuation is appropriate. His findings are subject to cross-examination, but the court will not apply *Daubert* to exclude Mr. Gomez from testifying.

D.   **Plaintiff's Motion to Exclude Mark Lareau and Thomas Hirchak**

Plaintiff seeks to exclude testimony from the real estate appraiser Mark Lareau regarding his opinion concerning the fair market value of the house before and after the fire. Mr. Lareau conducted a real estate appraisal using the comparable sales method. Plaintiff quarrels with one of the comparables which sold very close to the date on which it was placed on the market. Plaintiff argues that this comparable may have been underpriced.

Valuation of real estate through comparable sales is a well-established methodology. Plaintiff's criticism of the appraiser's choice of comparables may be appropriate for cross-examination, but it provides no basis for excluding the witness altogether.

Plaintiff's complaint that he cannot question Mr. Lareau about a revision to his opinion should be resolved through a second deposition, by phone if appropriate. It is also not a basis for excluding the witness several months before trial.

The other quibbles about the appraisal include a lengthy dispute about the value of two storage sheds, the unique qualities of the home, and the salvage value of the foundation. None of these issues raise serious *Daubert* questions.

Plaintiff also seeks to exclude the testimony of the Vermont auctioneer Thomas Hirchak. Mr. Hirchak is not able to provide a calculation of lost property value in this case because he has not had the opportunity to see the lost items before or after the loss and develop an opinion about the condition and value of each. It appears that if called at trial, he will testify to the impossibility of valuing the contents of a home without an opportunity to examine them before the fire. Mr. Hirchak certainly has many years of experience as an auctioneer and expert in estate sales. He is entitled to criticize the work of other property appraisers. *Daubert* provides no basis for excluding him as a witness although his restrictive views on the feasibility of valuing personal property after a loss will come as a surprise to the legions of insurance adjusters who are called upon to make such determinations on a daily basis.

The motion to exclude Mr. Lareau and Mr. Hirchak as witnesses is DENIED.

### III.     Motion to Strike Memorandum as Too Long (Doc. 36)

The court agrees with the defendant that the plaintiff's Motion to Preclude Defendant's Experts (Doc. 35), weighing in at a welterweight 66 pages, was too long. It violated Local Rule 7 and it was over-stuffed with deposition excerpts running on for pages at a time. One of the few undiluted pleasures of being a judge is that it is no longer necessary to attend civil depositions. Reading undigested portions of the transcripts was nearly as bad. The court marked

this one up as a newcomer's mistake and read the memorandum anyway. Having finished reading it, there is little percentage in striking it and reviewing a second, condensed version. The motion to strike (Doc. 36) is DENIED.

## Conclusion

The court DENIES the motions filed by both sides (Docs. 33, 34, 35, 36) to exclude the fire experts and the property appraisers and to strike one of the motions as over-long. The case remains set for trial in June 2017. The court will be grateful to hear from plaintiff's counsel that he will be available for trial during one of the weeks offered.

Dated at Rutland, in the District of Vermont, this 6 day of May, 2017.

Geoffrey W. Crawford, Judge
United States District Court